# EXHIBIT C

SEP-27-06   09:49AM   FROM-E.S.Q. Services                     618-286-0140          T-276   P.010/042   F-403

WCS&R

SEP 28 2006

RECEIVED

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 2 8 2006

John A. Clark, Executive Officer/Clerk
By _____ , Deputy
D. Garcia

1 | Robert F. Clarke, Esq.
CA Bar ID 79881
2 | PHILLIPS & ASSOCIATES
3030 North Third Street, Suite 1100
3 | Phoenix, Arizona 85012
Tel:   (602) 258-8900 ext. 295
4 | Fax:   (602) 279-9155

5 | Attorneys for Plaintiff

6 |        SUPERIOR COURT OF THE STATE OF CALIFORNIA

7 |            FOR THE COUNTY OF LOS ANGELES

8 | ANNE E. CLAYTON;                     Case No: ___ BC359113

9 |              Plaintiff,              COMPLAINT FOR DAMAGES

10 | vs.                                  and

11 | MERCK & CO., INC., a New Jersey      DEMAND FOR JURY TRIAL
corporation; MCKESSON
12 | CORPORATION, a Delaware corporation;
DOES 1-50,
13 |
              Defendants.
14 |
15 |       For their Complaint against the defendants, plaintiff allege:

16 |                            PARTIES

17 |       1.      Plaintiff Anne E. Clayton, is a citizen of the State of Idaho, and Plaintiff Anne E.

18 | Clayton was prescribed and ingested Fosamax™.

19 |       2.      Defendant Merck & Co., Inc., (hereafter, "Merck") is a corporation organized

20 | and existing under the laws of the State of New Jersey, with its principal place of business

21 | in New Jersey.  Merck was and is authorized to do business in the State of California and was

22 | engaged in substantial commerce and business activity in the County of Los Angeles.

23 |       3.      Defendant McKesson Corporation (hereafter, "McKesson") was and is a

24 | corporation organized and existing under the laws of the State of Delaware, with its principal

25 | place of business in San Francisco, California.  McKesson was and is authorized to do

26 | business in the State of California and was engaged in substantial commerce and business

1 | activity in the County of Los Angeles.

2 |     4.    The true names or capacities, whether individual, corporate, or otherwise, of
3 | Defendants Doe 1-50, are unknown to Plaintiff who therefore sue said Defendants by such
4 | fictitious names. Plaintiff believe and allege that each of the Defendants designated herein
5 | by fictitious names is in some manner legally responsible for the events and happenings
6 | herein referred to and proximately caused foreseeable damages to Plaintiff as alleged herein.

7 |     5.    At all times herein mentioned, "Defendants" include all named Defendants
8 | herein as well as Defendants Does 1-50.

9 |     6.    At all relevant times Defendants, through their agents, servants, employees and
10 | apparent agents, were the designers, manufacturers, marketers, distributors and/or sellers of
11 | Fosamax™, a bisphosphonate drug used primarily to mitigate or reverse the effects of
12 | osteoporosis, osteopenia, and Paget's Disease.

13 |     7.    Defendants, either directly or through their agents, apparent agents, servants
14 | or employees, at all relevant times, sold and distributed Fosamax™ in the State of California.

15 |     8.    Defendants derive substantial revenue from pharmaceutical products used or
16 | consumed in the State of California.

17 |     9.    Defendants expected or should have expected, that their business activities
18 | could or would have consequences within the State of California.

19 |     10.    Plaintiff bring this action to recover damages, restitution, refunds, loss of
20 | consortium and/or for equitable, injunctive and declaratory relief against Defendants.

21 |     11.    Defendants placed Fosamax™ into the stream of worldwide commerce and
22 | interstate commerce in the United States. It did so without adequate testing and with no
23 | warning that the drug carried with it a risk of causing osteonecrosis of the jaw.

24 |     12.    Plaintiff needs continued medical monitoring to prevent or mitigate the future
25 | onset of osteonecrosis of the jaw or treat osteonecrosis of the jaw which has already
26 | manifested.

## SUMMARY OF THE CASE

13.    Defendants, either directly or through their agents, apparent agents, servants or employees, designed, manufactured, marketed, advertised, distributed and sold Fosamax™ for the treatment of osteoporosis, Paget's disease, and other uses.

14.    As a result of the defective nature of Fosamax™, persons who were prescribed and ingested Fosamax™, including Plaintiff, have suffered and may continue to suffer severe and permanent personal injuries, including osteonecrosis of the jaw.

15.    Defendants concealed and continues to conceal its knowledge of Fosamax™'s unreasonably dangerous risks from Plaintiff, other consumers, and the medical community.

16.    Defendants failed to conduct adequate and sufficient post marketing surveillance of Fosamax™ after it began marketing, advertising, distributing, and selling the drug.

17.    As a result of Defendants' actions and inaction, Plaintiff was injured due to ingestion of Fosamax™, which has caused and will continue to cause Plaintiff various injuries and damages. Plaintiff accordingly seeks compensatory damages.

## FACTUAL BACKGROUND

18.    At all relevant times Defendants were responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing, and selling Fosamax™.

19.    In September, 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound alendronate sodium for various uses, including the treatment of osteoporosis and Paget's Disease. Alendronate sodium is marketed by Defendants as Fosamax™. Defendants did not provide the FDA with available data which was necessary to allow for a complete and informed approval process, and had the FDA been provided with such information, additional warnings would have been added to the label, including, but not limited to those pertaining to osteonecrosis..

20.    Fosamax™ falls within a class of drugs known as bisphosphonates.

3

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  Bisphosphonates are used for treating bone conditions such as osteoporosis and Paget's

2  Disease.  Other drugs within this class, such as Aredia™ and Zometa™, are used as

3  chemotherapy and as adjunct chemotherapy, but are not indicated for use in non-cancerous

4  conditions such as osteoporosis.

5       21.    There are two classes of bisphosphonates: the N-containing (nitrogenous) and

6  the non-N-containing (non nitrogenous) bisphosphonates. The nitrogenous bisphophonates

7  include the following: pamidronate (Aredia™), ibandronate (Bondronat), and alendronate

8  (Fosamax™).  The non-nitrogenous bisphosphonates include the following: etridonate

9  (Didronel™), clodronate (Bonefos™ and Loron™), and tiludronate (Skelid™). Alendronate

10  contains a nitrogen atom. The Physicians Desk Reference ("PDR") for Fosamax™ confirms

11  that the molecule contains a nitrogen atom.

12       22.    Throughout the 1990's and 2000's, medical articles and studies appeared

13  reporting the frequent and common occurrence of osteonecrosis of the jaw within

14  chemotherapy patients taking nitrogenous bisphosphonates.  As with its reported and

15  acknowledged side effects concerning irritation, erosion, and inflammation of the upper

16  gastrointestinal tract, Defendants knew or should have known that Fosamax™, as a

17  nitrogenous bisphosphonate, shared an adverse event profile similar to the other drugs within

18  this specific subclass of bisphosphonates (i.e., those containing nitrogen).

19       23.    Defendants knew and or should have known that bisphosphonates, including

20  Fosamax™, inhibit endothelial cell function.  Similarly, Defendants knew or should have

21  known that bisphosphonates also inhibit vascularization of the affected area and induce

22  ischemic changes specific to patients' mandibles (lower jaws) and maxillae (upper jaws) and

23  that these ischemic changes appear to be cumulative in nature, all of which provided

24  Defendants with more than reasonable evidence of a causal association between the use of

25  Fosamax™ and osteonecrosis, a clinically significant hazard.

26       24.    Defendants also knew or should have known that these factors combine to

4
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    create a compromised vascular supply in the affected area. As a result, a minor injury or
2    disease can turn into a non-healing wound, which can progress to widespread osteomyelitis
3    (inflammation of bone marrow) and ultimately osteonecrosis (bone death).

4        25.    Dentists are now being advised by dental associations to refrain from
5    undertaking any invasive procedure (such as drilling a cavity) for any patient on Fosamax™.

6        26.    Once the osteonecrosis begins and becomes symptomatic, it is very difficult
7    to treat and typically is not reversible.

8        27.    Shortly after Defendants began selling Fosamax™, reports of onteonecrosis
9    of the jaw and other dental complications among users began surfacing, indicating that
10   Fosamax™ shared the class effects of the other nitrogenous bisphosphonates. Despite this
11   knowledge, Defendants failed to implement further studies regarding the risk of
12   osteonecrosis of the jaw relative to Fosamax™. Rather than evaluating and verifying the
13   safety of Fosamax™ with respect to osteonecrosis of the jaw, Defendants proposed further
14   uses of Fosamax™, such as Fosamax™-D, and sought to extend the exclusivity period of
15   Fosamax™ through 2018.

16       28.    Osteonecrosis of the jaw is a serious medical event and can result in severe
17   disability and death.

18       29.    Since Fosamax™ was released, the FDA has received a significant number of
19   reports of osteonecrosis of the jaw among users of Fosamax™.

20       30.    On August 25, 2004 the United States Food & Drug Administration ("FDA")
21   posted its ODS Postmarketing Safety Review on bisphosphonates, specifically pamidronate
22   (Aredia™), zoledronic acid (Zometa™), risedronate (Actonel™), and alendronate
23   (Fosamax™). This was an epidemiologic review of the FDA adverse events database
24   conducted by the FDA's Division of Drug Risk Evaluation.

25       31.    As a result of the FDA Review, the FDA observed that the risk of osteonecrosis
26   of the jaw was not confined to bisphosphonates used for chemotherapy. The FDA's review

5
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  indicated that the osteonecrosis of the jaw was a class effect which specifically extended to
2  the oral bisphosphonate, Fosamax™.

3      32.    As a result, the FDA recommended and stated that the labeling for Fosamax™
4  should be amended by Merck to specifically warn about the risk of osteonecrosis of the jaw.
5  Defendants have refused to accede to the FDA's request and, to this day, still do not
6  adequately warn of the risk of osteonecrosis of the jaw in its Fosamax™ labeling.

7      33.    Rather than warn patients and despite knowledge known by Defendants about
8  increased risk of osteonecrosis of the jaw on patients using Fosamax™, Defendants continue
9  to defend Fosamax™, mislead physicians and the public, and minimize unfavorable findings.
10

11      34.    Fosamax™ is one of the Defendants' top selling drugs, averaging more than
12  $3 billion a year in sales.

13      35.    Consumers, including Plaintiff, who have used Fosamax™ for treatment of
14  osteoporosis, have several alternative safer products available to treat the conditions.

15      36.    Defendants knew of the significant risk of dental and oral complications caused
16  by ingestion of Fosamax™, but Defendants did not adequately and sufficiently warn
17  consumers, including Plaintiff, or the medical community, of such risk.

18      37.    As a direct result, Plaintiff was prescribed Fosamax™ and has been
19  permanently and severely injured, having suffered serious consequences from the ingestion
20  of Fosamax™. Plaintiff requires and will in the future require ongoing medical care and
21  treatment.

22      38.    Plaintiff has suffered mental anguish from the knowledge that Plaintiff will
23  have life-long complications as a result of the injuries Plaintiff sustained from the use of
24  Fosamax™.

25      39.    Plaintiff was prescribed and used Fosamax™ in a foreseeable manner pursuant
26  to her prescriptions.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    40.    Plaintiff, as a direct and proximate result of using Fosamax™, suffered severe
2  mental and physical pain and suffering and has sustained permanent injuries and emotional
3  distress.

4    41.    Plaintiff used Fosamax™ which had been provided in a condition that was
5  substantially the same as the condition in which it was manufactured and sold.

6    42.    Plaintiff would not have used Fosamax™ had Defendants properly disclosed
7  the risks associated with the drug. Alternatively, Plaintiff would have known and/or
8  recognized the precursor events of osteonecrosis of the jaw and would have been able to
9  avoid the clinical manifestation of the disease.

10    43.    Defendant, through their affirmative misrepresentations and omissions, actively
11  concealed from Plaintiff and their physicians the true and significant risks associated with
12  taking Fosamax™. The running of any applicable Statute of Limitations has been tolled by
13  reason of Defendants' fraudulent concealment.

14    44.    As a result of Defendants' actions, Plaintiff and her prescribing physicians
15  were unaware, and could not have reasonably known or have learned through reasonable
16  diligence, that Plaintiff had been exposed to the risk identified in this complaint, and that
17  those risks were the direct and proximate result of Defendants' acts, omissions, and
18  misrepresentations.

19                          **FIRST CAUSE OF ACTION**
                                  (Negligence)
20

21    45.    Plaintiff restates the allegations set forth above as if fully rewritten herein.

22    46.    Defendants owed Plaintiff, and other consumers, a duty to exercise reasonable
23  care when designing, manufacturing, marketing, advertising, distributing, and selling
    Fosamax™.
24
25    47.    Defendants failed to exercise due care under the circumstances and therefore
    breached this duty by:
26

7
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1          a.     Failing to properly and thoroughly test Fosamax™ before releasing the
2 drug to market;

3          b.     Failing to properly and thoroughly analyze the data resulting from the
4 pre-marketing tests of Fosamax™;

5          c.     Failing to conduct sufficient post-market testing and surveillance of
6 Fosamax™;

7          d.     Designing, manufacturing, marketing, advertising, distributing, and
8 selling Fosamax™ to consumers, including Plaintiff, without an adequate warning of the
9 significant and dangerous risks of Fosamax™ and without proper instructions to avoid the
10 harm which could foreseeably occur as a result of using the drug;

11          e.     Failing to exercise due care when advertising and promoting
12 Fosamax™; and,

13          f.     Negligently continuing to manufacture, market, advertise, and distribute
14 Fosamax™ after Defendants knew or should have known of its adverse effects.

15     48.     As a direct and proximate consequence of Defendants' actions, omissions, and
16 misrepresentations, Plaintiff suffered serious personal injuries. In addition, Plaintiff required
17 and will continue to require healthcare and services. Plaintiff has incurred and will continue
18 to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer
19 diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of
20 premature death, aggravation of preexisting conditions and activation of latent conditions,
21 and other losses and damages. Plaintiff's direct medical losses and costs include care for
22 hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff
23 has incurred and will continue to incur mental and physical pain and suffering. Plaintiff has
24 suffered loss of wages and wage-earning capacity.

25     49.     Defendants' conduct as described above was committed with knowing,
26 conscious, wanton, willful, and deliberate disregard for the value of human life and the rights

8

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so

2  as to punish Defendants and deter them from similar conduct in the future.

3            **WHEREFORE,** Plaintiff demands judgment against Defendants and seek

4  compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,

5  attorneys' fees and such other and future relief as the Court deems just and proper.

6                              ## SECOND CAUSE OF ACTION
                                  ### (Strict Liability)

7

8      50.    Plaintiff restates the allegations set forth above as if fully rewritten herein.

9      51.    Defendants manufactured, sold, distributed, marketed, and/or supplied

10  Fosamax™ in a defective and unreasonably dangerous condition to consumer, including

    Plaintiff.

11

12     52.    Defendants designed, manufactured, sold, distributed, supplied marketed,

    and/or promoted Fosamax™, which was expected to reach and did in fact reach consumers,

13

    including Plaintiff, without substantial change in the condition in which it was manufactured

14
    and sold by Defendants.

15
       53.    Plaintiff used Fosamax™ as prescribed and in a manner normally intended,

16
    recommended, promoted and marketed by Defendants.

17
       54.    Fosamax™ failed to perform safely when used by ordinary consumers,

18
    including Plaintiff, including when it was used as intended and in a reasonably foreseeable

19
    manner.

20
       55.    Fosamax™ was defective in its design and was unreasonably dangerous in that

21
    its unforeseeable risks exceeded the benefits associated with its design or formulation.

22
       56.    Fosamax™ was defective in design or formulation in that it posed a greater

23
    likelihood of injury than other similar medications and was more dangerous than an ordinary

24
    consumer could reasonably foresee or anticipate.

25
       57.    Fosamax™ was defective in its design and was unreasonably dangerous in that

26

                                        9

1  it neither bore nor was packaged with nor accompanied by warnings adequate to alert
2  consumers, including Plaintiff, of the risks described herein, including, but not limited to, the
3  risk of osteonecrosis of the jaw.

4      58.    Although Defendants knew or should have known of the defective nature of
5  Fosamax™, it continued to design, manufacture, market, and sell Fosamax™ so as to
6  maximize sales and profits at the expense of the public health and safety. By so acting,
7  Defendants acted with conscious and deliberate disregard of the foreseeable harm caused by
8  Fosamax™.

9      59.    Plaintiff could not, through the exercise of reasonable care, have discovered
10 Fosamax™'s defects or perceived the dangers posed by the drug.

11     60.    As a direct and proximate consequence of Defendants' conduct, Plaintiff
12 suffered serious personal injuries. In addition, Plaintiff required and will continue to require
13 healthcare. Plaintiff has incurred and will continue to incur medical and related expenses,
14 Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment
15 of life, a diminished quality of life, increased risk of premature death, aggravation of
16 preexisting conditions and activation of latent conditions, and other losses and damages
17 Plaintiff's direct medical losses and costs include care for hospitalization, physician care,
18 monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue
19 to incur mental and physical pain and suffering. Plaintiff has suffered loss of wages and
20 wage-earning capacity.

21     61.    Defendants' conduct as described above was committed with knowing,
22 conscious, wanton, willful, and deliberate disregard for the value of human life and the rights
23 and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so
24 as to punish Defendants and deter them from similar conduct in the future.

25         **WHEREFORE,** Plaintiff demands judgment against Defendants and seeks
26 compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,

10

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    attorneys' fees and such other and future relief as the Court deems just and proper.

2    / / /

3                           **THIRD CAUSE OF ACTION**
                            **(Breach of Express Warranty)**
4

5        62.    Plaintiff restate the allegations set forth above as if fully rewritten herein.

6        63.    Defendants expressly represented to Plaintiff and other consumers and the
     medical community that Fosamax™ was safe and fit for its intended purposes, that it was of
7    merchantable quality, that it did not produce any dangerous side effects, and that it was
8    adequately tested.

9        64.    Fosamax™ does not conform to Defendants' express representations because
10   it is not safe, has numerous and serious side effects, and causes severe and permanent
11   injuries.

12       65.    At all relevant times Fosamax™ did not perform as safely as an ordinary
13   consumer would expect, when used as intended or in a reasonably foreseeable manner.

14       66.    Plaintiff, other consumers, and the medical community relied upon Defendants'
15   express warranties.

16       67.    As a direct and proximate result of Defendants' actions, Plaintiff suffered
17   serious personal injuries.  In addition, Plaintiff required and will continue to require
18   healthcare and services. Plaintiff has incurred and will continue to incur medical and related
19   expenses. Plaintiff also has suffered and will continue to suffer diminished capacity for the
20   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation
21   of preexisting conditions and activation of latent conditions, and other losses and damages.
22   Plaintiff' direct medical losses and costs include care for hospitalization, physician care,
23   monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue
24   to incur mental and physical pain and suffering. Plaintiff has suffered loss of wages and
25   wage-earning capacity.

26

                                    11
                  COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    68.   Defendants' conduct as described above was committed with knowing,

2 conscious, wanton, willful, and deliberate disregard for the value of human life and the rights

3 and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so

4 as to punish Defendants and deter them from similar conduct in the future.

5      **WHEREFORE**, Plaintiff demands judgment against Defendants and seek

6 compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,

7 attorneys' fees and such other and future relief as the Court deems just and proper.

8                    **FOURTH CAUSE OF ACTION**
                  **(Breach of Implied Warranty)**

9

10    69.   Plaintiff restates the allegations set forth above as if fully rewritten herein.

    70.   Defendants manufactured, distributed, advertised, promoted and sold

11 Fosamax™.

12

13    71.   At all relevant times, Defendants knew of the use for which Fosamax™ was

14 intended and impliedly warranted the product to be of merchantable quality and safe and fit

for such use.

15

16    72.   Defendants were aware that consumers, including Plaintiff, would use

Fosamax™ for treatment of osteoporosis and for other purposes.

17

18    73.   Plaintiff and the medical community reasonably relied upon the judgment and

sensibility of Defendants to sell Fosamax™ only if it was indeed of merchantable quality and

19 safe and fit for its intended use.

20

21    74.   Defendants breached their implied warranty to consumers, including Plaintiff;

Fosamax™ was not of merchantable quality or safe and fit for its intended use.

22

23    75.   Consumers, including Plaintiff, and the medical community, reasonably relied

upon Defendants' implied warranty for Fosamax™.

24

25    76.   Fosamax™ reached consumers without substantial change in the condition in

which it was manufactured and sold by Defendants.

26

77.    As a direct and proximate result of Defendants' actions, Plaintiff suffered serious personal injuries. In addition, Plaintiff required and will continue to require healthcare services. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff has suffered and will continue to suffer diminished capacity for enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and cost include care for hospitalization, physician care, monitoring, treatment, medications and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering. Plaintiff have suffered loss of wages and wage-earning capacity.

78.    Defendants' conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit, attorneys' fees and such other and future relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

79.    Plaintiff restate the allegations set forth above as if fully rewritten herein.

80.    Defendants made fraudulent misrepresentations with respect to Fosamax™ in the following particulars:

a.    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that Fosamax™ had been tested and found to be safe and effective for the treatment and prevention of osteoporosis; and

13
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1        b.    Defendants represented that Fosamax™ was safer than other alternative
2 medications.

3      81.    Defendants knew that their representations were false, yet they willfully,
4 wantonly, and recklessly disregarded its obligation to provide truthful representations
5 regarding the safety and risk of Fosamax™ to consumers, including Plaintiff, and the medical
6 community.

7      82.    The representations were made by Defendants with the intent that doctors and
8 patients, including Plaintiff, rely upon them.

9      83.    Defendants' representations were made with the intent of defrauding and
10 deceiving Plaintiff, other consumers, and the medical community to induce and encourage
11 the sale of Fosamax™.

12      84.    Plaintiff's doctors, and others relied upon the representations.

13      85.    Defendants' fraudulent representations evinced its callous, reckless, willful,
14 and depraved indifference to the health, safety and welfare of consumers, including Plaintiff.

15      86.    As a direct and proximate result, Plaintiff suffered serious personal injuries.
16 In addition, Plaintiff required and will continue to require healthcare services. Plaintiff has
17 incurred and will continue to incur medical and related expenses. Plaintiff has suffered and
18 will continue to suffer diminished capacity for enjoyment of life, a diminished quality of life,
19 increased risk of premature death, aggravation of preexisting conditions and activation of
20 latent conditions, and other losses and damages. Plaintiff's direct medical losses and cost
21 include care for hospitalization, physician care, monitoring, treatment, medications and
22 supplies. Plaintiff has incurred and will continue to incur mental and physical pain and
23 suffering. Plaintiff has suffered loss of wages and wage-earning capacity.

24      87.    Defendants' conduct as described above was committed with knowing,
25 conscious, wanton, willful, and deliberate disregard for the value of human life and the rights
26 and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  as to punish Defendant and deter it from similar conduct in the future.

2          **WHEREFORE**, Plaintiff demands judgment against Defendants and seek

3  compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,

4  attorneys' fees and such other and future relief as the Court deems just and proper.

5                      ## SIXTH CAUSE OF THE ACTION
                        ### (Fraudulent Concealment)

6

7          88.    Plaintiff restates the allegations set forth above as if fully rewritten herein.

8          89.    Defendants made fraudulent misrepresentations with respect to Fosamax™ in

   the following particulars:

9

10              a.      Defendants represented through its labeling, advertising, marketing

11  materials, detail persons, seminar presentations, publications, notice letters, and regulatory

   submissions that Fosamax™ was safe and fraudulently withheld and concealed information

12  about the substantial risks of using Fosamax™; and

13

14              b.      Defendants represented that Fosamax™ was safer than other alternative

   medications and fraudulently concealed information which demonstrated that Fosamax™

15  was not safer than alternatives available on the market.

16          90.    Defendants had sole access to material facts concerning the dangers and

17  unreasonable risks of Fosamax™.

18          91.    The concealment of information by Defendants about the risks of Fosamax™

19  was intentional, and the representations made by Defendants were known by Defendants to

20  be false.

21          92.    The concealment of information and the misrepresentations about Fosamax™

22  were made by Defendants with the intent that doctors and patients including Plaintiff, rely

23  upon them.

24          93.    Plaintiff' doctors, and others relied upon the representations and were unaware

25  of the substantial dental and oral risks of Fosamax™ which Defendants concealed from

26

                                15
                COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 Plaintiff's doctors and Plaintiff.

2       94.    As a direct and proximate result of Defendants' fraudulent concealment and
3 misrepresentation, Plaintiff suffered serious personal injuries. In addition, Plaintiff required
4 and will continue to require healthcare services. Plaintiff has incurred and will continue to
5 incur medical and related expenses. Plaintiff has suffered and will continue to suffer
6 diminished capacity for enjoyment of life, a diminished quality of life, increased risk of
7 premature death, aggravation of preexisting conditions and activation of latent conditions,
8 and other losses and damages. Plaintiff' direct medical losses and cost include care for
9 hospitalization, physician care, monitoring, treatment, medications and supplies. Plaintiff
10 has incurred and will continue to incur mental and physical pain and suffering. Plaintiff has
11 suffered loss of wages and wage-earning capacity.

12      95.    Defendants' conduct as described above was committed with knowing,
13 conscious, wanton, willful, and deliberate disregard for the value of human life and the rights
14 and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so
15 as to punish Defendant and deter it from similar conduct in the future.

16      **WHEREFORE,** Plaintiff demands judgment against Defendants and seek
17 compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,
18 attorneys' fees and such other and future relief as the Court deems just and proper.

19                       **SEVENTH CAUSE OF ACTION**
                              **(Equitable Relief)**
20               **(Medical Monitoring Program and Proper Labeling)**

21      96.    Plaintiff restate the allegations set forth above as it fully rewritten herein.

22      97.    As a direct and proximate result of Defendants' acts, Plaintiff face an increased
23 susceptibility to injuries as described herein. The irreparable threat to their health can only
24 be mitigated by the creation of a medical monitoring fund to provide for a medical
25 monitoring program, including: notifying Plaintiff and subclasses of the defects and the
26 potential medical harm; funding of a program for the surgical treatment of osteonecrosis of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 the jaw; funding a study for the long term effects of Fosamax™ upon Plaintiff; gathering and
2 forwarding to treating physicians information relating to the diagnosis and treatment of
3 injuries which may result from the product; and funding for diagnosis and preventative
4 medical treatment, particularly dental and oral monitoring.

5        98.    Plaintiff has no adequate remedy in law in that monetary damages alone do not
6 compensate for the insidius and continuing nature of the harm to them, and only a medical
7 monitoring program which notified Plaintiff and aids in correcting the problems can prevent
8 the greater harms which may not occur immediately and which may be preventable, if proper
9 research is conducted and the health risk are diagnosed and treated before they occur or
10 become worse.

11        99.    Plaintiff has suffered irreparable harm as alleged herein and, in the absence of
12 equitable relief, Plaintiff will suffer further irreparable harm such as death and severe and
13 debilitating injuries from continued retention of the defective drug.  Without a medical
14 monitoring program, Plaintiff might not receive prompt medical care which could prolong
15 their productive lives, increase prospects for improvement and minimize disability.

16        100.    Additionally, Defendants have refused to fully abide by the FDA's request to
17 amend the Fosamax™ product labeling information to warn physicians and patients about
18 the risk of osteonecrosis of the jaw.  Because of their failure, prescribing physicians are
19 unable to warn patients to be aware of precursor symptoms which, if properly observed and
20 reported to the physician, could result in discontinuation of Fosamax™ therapy and the
21 prevention or mitigation of serious injury, including osteonecrosis of the jaw.  This Court
22 should use its equitable powers, in the interest of the public safety and in order to make sure
23 that prescribing physicians have a complete understanding of the risks associated with
24 Fosamax™ to require Defendant to change its label in a format approvable by the FDA to
25 adequately warn physicians and Fosamax™ patients about the risk of osteonecrosis of the
26 jaw and steps which can be taken to prevent or mitigate its occurrence.

1    **WHEREFORE,** Plaintiff demands judgment against Defendants and seek

2 equitable relief in the form of a medical monitoring program this Court's order that Defendants

3 change the labeling of Fosamax™ to appropriately warn of the risk of osteonecrosis of the jaw.

4                              **EIGHTH CAUSE OF ACTION**
                    **(Violation of Business & Profession Code Section 17200)**
5

6    101.    Plaintiff restate the allegations set forth above as it fully rewritten herein.

7    102.    Plaintiff are informed and believe and allege that Defendants, by the acts and

misconduct alleged herein, violated Business and Professions Code sections 17200.
8

9    103.    California Business & Professions Code Section 17200 provides that unfair

competition shall mean and include "all unlawful, unfair or fraudulent business practices and
10
unfair, deceptive, untrue or misleading advertising."
11

12    104.    The acts and practices described herein were and are likely to mislead the

general public and therefore constitute unfair business practices within the meaning of
13
Business & Professions Code Section 17200. The acts and untrue and misleading advertising
14
set forth in presiding paragraphs are incorporated by reference and are, by definition,
15
violations of Business & Professions Code Section 17200. This conduct includes, but is not
16
limited to:
17

18    a.    Representing to Plaintiff, Plaintiff' physicians and the general public

that Fosamax™ was safe, fit and effective for human consumption, knowing that said
19
representations were false, and concealing from the Plaintiff, Plaintiff physicians and the
20
general public that Fosamax™ has a serious propensity to cause injuries to users;
21

22    b.    Engaging in advertising programs designed to create the image,

impression and belief by consumers, physicians and others that the use of Fosamax™ was
23
safe for human use, had fewer side effects and adverse reactions than other methods for
24
treating mental illness, constituted a convenient, safe form for treating mental illness and
25
would not interfere with daily life, even though the Defendants knew these to be false, and
26

18
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 even though the Defendants had no reasonable grounds to believe them to be true;

2          c.      Purposely downplaying and understating the health hazards and risks
3 associated with Fosamax™; and

4          d.      Issuing promotional literature deceiving potential users of Fosamax™
5 by relaying positive information and manipulating statistics to suggest widespread
6 acceptability, while downplaying the known adverse and serious health effects and
7 concealing material relevant information regarding the safety of Fosamax™.

8          105.    These practices constitute unlawful, unfair and fraudulent business acts or
9 practices, within the meaning of California Business & Professions Code Section 17200, as
10 well as unfair, deceptive, untrue and misleading advertising as prohibited by California
11 Business & Professions Code Section 17500, as set forth herein.

12          106.    The unlawful, unfair and fraudulent business practices of Defendants described
13 above present a continuing threat to members of the public in that Defendants continue to
14 engage in the conduct described therein.

15          107.    As a result of their conduct described above, Defendants have been unjustly
16 enriched. Specifically, Defendants have been unjustly enriched by receipt of hundreds of
17 millions of dollars in ill-gotten gains from the sale and prescription of Fosamax™ in
18 California, and other states, sold in large part as a result of the acts and omissions described
19 herein.

20          108.    Because of the fraudulent misrepresentations made by Defendants as detailed
21 above, and the inherently unfair practice of committing a fraud against the Plaintiff and
22 public by intentionally misrepresenting and concealing material information, the acts of
23 Defendant described herein constitute unfair or fraudulent business practices.

24          109.    Plaintiff, pursuant to California Business & Professions Code Section 17203,
25 seek an order of this court compelling the Defendant to provide restitution, and to disgorge
26 the monies collected and profits realized by Defendants, and each of them, as a result of their

1  unfair business practices.

2      110.   Defendants' acts were willful, wanton, reckless and fraudulent; hence, Plaintiff
3  are entitled to exemplary damages, inter alia.

4          **WHEREFORE,** Plaintiff demands judgment against Defendants and seek
5  compensatory damages, disgorgement, restitution, and exemplary and punitive damages together
6  with interest, the costs of suit, attorneys' fees and such other and future relief as the Court deems just
7  and proper.

8                          **NINTH CAUSE OF ACTION**
                **(Violation of Business & Profession Code Section 17500)**
9
         111.   Plaintiff restate the allegations set forth above as it fully rewritten herein.
10
         112.   Plaintiff are informed and believe and thereon allege that Defendants, by the
11
    acts and misconduct alleged herein, violated Business & Professions Code Section 17500.
12
         113.   Plaintiff hereby seek restitution, as well as and punitive damages against
13
    Defendants for their violations of section 17500.
14
         114.   California Business & Professions Code section 17500 provides that it is
15
    unlawful for any person, firm, corporation or association to dispose of property or perform
16
    services, or to induce the public to enter into any obligation relating thereto, through the use
17
    of untrue or misleading statements.
18
         115.   At all times herein mentioned, Defendants have committed the acts of
19
    disseminating untrue and misleading statements as defined by Business & Professions Code
20
    Section 17500 by engaging in the following acts and practices with intent to induce members
21
    of the public to purchase and use Fosamax™:
22
            a.     Representing to Plaintiff, Plaintiff' physicians and the general public
23
    that Fosamax™ was safe, fit and effective for human consumption, knowing that said
24
    representations were false, and concealing from the Plaintiff, Plaintiff' physicians and the
25
    general public that Fosamax™ have a serious propensity to cause injuries to users;
26

                                   20
                 COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1       b.    Engaging in advertising programs designed to create the image,
2 impression and belief by consumers, physicians and others that the use of Fosamax™ was
3 safe for human use, had fewer side effects and adverse reactions than other methods for
4 treating mental illness, constituted a convenient, safe form for treating mental illness and
5 would not interfere with daily life, even though the Defendants knew these to be false, and
6 even though the Defendants had no reasonable grounds to believe them to be true;

7       c.    Purposely downplaying and understating the health hazards and risks
8 associated with Fosamax™; and

9       d.    Issuing promotional literature deceiving potential users of Fosamax™
10 by relaying positive information and manipulating statistics to suggest widespread
11 acceptability, while downplaying the known adverse and serious health effects and
12 concealing material relevant information regarding the safety of Fosamax™.

13    116.   The foregoing practices constitute false and misleading advertising within the
14 meaning of California Business & Professions Code Section 17500.

15    117.   As a result of its false and misleading statements described above, Defendants
16 have been and will be unjustly enriched. Specifically, Defendants have been unjustly
17 enriched by receipt of hundreds of millions of dollars from the sale and prescription of
18 Fosamax™ in California and other states, sold in large part as a result of the false or
19 misleading statements described herein.

20    118.   Pursuant to California Business & Professions Code Section 17535, Plaintiff
21 seek an order of this court compelling the Defendants to provide restitution, and to disgorge
22 the monies collected and profits realized by Defendants, and each of them, as a result of their
23 unfair business practices, and injunctive relief calling for Defendants to cease such unfair
24 business practices in the future.

25       **WHEREFORE**, Plaintiff demands judgment against Defendants and seek
26 compensatory damages, disgorgement, restitution, and exemplary and punitive damages together

1  with interest, the costs of suit, attorneys' fees and such other and future relief as the Court deems just

2  and proper.

3  / / /

4  / / /

## TENTH CAUSE OF ACTION
### (Loss of Consortium)

6

7  119.    Plaintiff restate the allegations set forth above as if fully rewritten herein.

120.    Plaintiff Ruth P. Morris and Buddy W. Penn bring this cause of action.

8

9  121.    By reason of the injuries sustained by Plaintiff Anne e. Clayton, Plaintiff Ruth A.

10  Morris has been and will continue to be deprived of consortium, society, comfort, protection, and

11  service, thereby causing and continuing to cause said Plaintiff grief, sorrow, mental anguish,

12  emotional distress and pain and suffering.

13  122.    By reason of the injuries sustained by Plaintiff Judy C. Penn, Plaintiff Buddy W. Penn

14  has been and will continue to be deprived of consortium, society, comfort, protection, and service,

15  thereby causing and continuing to cause said Plaintiff grief, sorrow, mental anguish, emotional

16  distress and pain and suffering.

17  **WHEREFORE,** Plaintiff demands judgment against Defendants and seek

18  compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,

19  attorneys' fees and such other and future relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### (Punitive Damages)

21  123.    Plaintiff restate the allegations set forth above as if fully rewritten herein.

22  124.    Defendants have repeatedly engaged in a pattern of conduct of deliberately

23  avoiding FDA recommendations as to public hazards which should be warned about.

24  125.    For instance, in March, 2000, Merck completed a study called VIGOR (Vioxx

25  Gastrointestinal Outcomes Research) relating to its prescription Cox-2 inhibitor, Vioxx. The

26  VIGOR study showed that Vioxx patients had more than double the rate of serious

1 cardiovascular problems than those on Naproxen, an older non-steroidal anti-inflammatory
2 drug. The study was published in the New England Journal of Medicine.

3        126.   In September, 2001, the FDA warned Merck to stop misleading doctors about
4 Vioxx's effect on the cardiovascular system. Merck was admonished to stop minimizing the
5 risks of the drug in its marketing. Despite that, Merck refused to adequately warn physicians
6 and patients about the risk of heart attacks and Vioxx.

7        127.   On August 25, 2004, a representative from the FDA presented results of a
8 database analysis of 1.4 million patients. The analysis demonstrated that Vioxx users were
9 more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or
10 older non-steroidal drugs. The FDA representative concluded that Vioxx was linked to more
11 than 27,000 heart attacks or sudden cardiac deaths nationwide from the time in came on the
12 market in 1999 through 2003.

13        128.   On August 26, 2004, Merck released a press statement which refuted the FDA
14 analysis and restated Merck's support for the cardiovascular safety of Vioxx.

15        129.   On September 30, 2004, Merck recalled Vioxx from the market, after having
16 to halt the APPROVe (Adenomatous Polyp Prevention On Vioxx) study. The study was
17 underway to evaluate the use of Vioxx for recurrent colon polyps. The researchers found an
18 alarming number of cardiovascular events among the drug's users in the APPROVe study.

19        130.   At that same time, Defendants were aware that the FDA, as of August 24,
20 2004, was advising Merck to warn about the risk of osteonecrosis of the jaw for its
21 Fosamax™ patients. Because Merck knew that its blockbuster drug Vioxx was about to be
22 pulled from the market, placing more importance on the more than $3 billion annual sales
23 of Fosamax™, Merck deliberately chose not to amend its packaging of Fosamax™ to include
24 the risk of osteonecrosis of the jaw, fearing that such a warning would result in reduced
25 revenues for its second largest income producer, Fosamax™.

26        131.   Merck's acts were willful and malicious in that Merck's conduct was carried

23

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  on with a conscious disregard for the safety and rights of Plaintiff and all others taking
2  Fosamax™. Merck's unconscionable conduct thereby warrants an assessment of exemplary
3  and punitive damages against Merck in an amount appropriate to punish Merck and deter
4  similar conduct in the future.

5       **WHEREFORE**, Plaintiff demands judgment against Defendants and seek
6  compensatory damages, and exemplary and punitive damages together with interest, the costs of suit,
7  attorneys' fees and such other and future relief as the Court deems just and proper.

8  ## PRAYER FOR RELIEF

9       **WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and/or
10 severally, as follows:

11     a.    For general damages in an amount to be proven at the time of trial;

12     b.    For special damages in an amount to be proven at time of trial;

13     c.    For exemplary and punitive damages in an amount to be proven at the time of
14 trial, and sufficient to punish Defendant or to deter Defendant and others from repeating the
15 injurious conduct alleged herein;

16     d.    For prejudgment and post-judgment interest on the above general and special
17 damages;

18     e.    For disgorgement;

19     f.    For restitution;

20     g.    For costs and attorneys' fees; and

21     h.    All other relief that Plaintiff may be entitled to at equity or at law, including
22 but not limited to the funding of a medical monitoring program and compelling Defendants
23 to adequately warn about the risk of osteonecrosis of the jaw with use of Fosamax™.

24 ## DEMAND FOR JURY TRIAL

25     Plaintiff demands a trial by jury on all claims so triable in this action.

26 / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

SEP-27-06    09:56AM    FROM-E.S.Q. Services                619-296-0140        T-276    P.034/042    F-403

1 / / /

2 / / /

3 / / /

4 / / /

5          Dated:  August 15, 2006                    Respectfully submitted,

6                                                     PHILLIPS & ASSOCIATES

7

8                                          By

9                                             Robert F. Clarke, Esq.
                                              3030 North Third Street, Suite 1100
                                              Phoenix, Arizona 85012
10                                            Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

25
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# EXHIBIT D



Alshakanbeh v. Food Lion, LLC
M.D.Fla.,2007.
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.
Fatenh ALSHAKANBEH, Plaintiff,
v.
FOOD LION, LLC, Defendant.
**No. 3:06-cv-1094-J-12HTS.**

March 23, 2007.

Philip Daniel Williams, Magid & Williams, P.A.,
Jacksonville, FL, for Plaintiff.
F. Damon Kitchen, Lori K. Mans, Constangy, Brooks
& Smith, LLC, Jacksonville, FL, for Defendant.

***ORDER***

HOWELL W. MELTON, Senior United States
District Judge.
**\*1** This cause is before the Court on the Plaintiffs
Motion to Remand (Doc.7) and the "Defendant's
Response in Opposition ..." (Doc. 12), filed January
12 and 29, 2007, respectively. The Court held a
hearing on the Motion to Remand on February 21,
2007. The sole issue before the Court is whether this
case meets the jurisdictional amount in controversy
requirement of 28 U.S.C. § 1332(a). The parties
agreed at the hearing that the record before the Court
is sufficient for it to make its ruling and that
additional discovery is not necessary. For the reasons
set forth below, the Court finds that the Defendant
has demonstrated by a preponderance of the evidence
that the amount in controversy in this case exceeds
$75,000, exclusive of interest and costs, and therefore
will deny the Motion to Remand.

The Plaintiff filed her employment discrimination
Complaint (Doc.2) in the Circuit Court, in and for
Duval County, Florida, asserting that the she was
subjected to a hostile working environment, was
denied promotion, and ultimately, was terminated by
the Defendant in retaliation for her complaints of

discrimination, on the basis of her race, national
origin, and religion. Doc. 2 at ¶¶ 10-12. She seeks
"damages that exceed $15,000.00 exclusive of
prejudgment interest, costs and attorneys' fees."Doc.
2 at ¶ 1. She claims that "[a]s a direct and proximate
result of the discrimination, harassment and
retaliation described [in her Complaint], Plaintiff has
suffered and continues to suffer loss of employment,
loss of income, loss of other employment benefits
and has suffered and continues to suffer mental
anguish, distress, humiliation, great expense, and loss
of enjoyment of life."Doc.2 at ¶ 13. She states that
the actions of the Defendant caused her to hire an
attorney and that she has incurred and will continue
to incur attorneys' fees and costs. Doc. 2 at ¶ 14. She
seeks "relief in the form of economic damages, back
pay and front pay, compensatory and emotional
distress damages, punitive damages, reimbursement
for attorneys' fees and costs, prejudgment interest,
equitable relief and reinstatement, and any other such
relief that the Court deems appropriate."Doc. 2 at p.
5. Other than the allegations set forth in her
Complaint, the record contains no other indications
from the Plaintiff regarding the amounts of damages
that she is seeking.

Whether a case is removable to federal court is
determined on the basis of the Plaintiffs Complaint at
the time of removal and any uncertainties regarding
removal should be resolved in favor of the Plaintiff.
See Burns v. Windsor, 31 F.3d 1092, 1095 (11th
Cir.1994). Because the amount of damages the
Plaintiff seeks is not specified in the Complaint (Doc.
2), or otherwise apparent from its face, in order to
defeat Plaintiff's Motion to Remand (Doc.7) the
burden is on the Defendant to establish by a
preponderance of the evidence that the amount in
controversy in this case exceeds $75,000 .00,
exclusive of interest and costs. Williams v. Best Buy
Co., 269 F.3d 1316, 1319 (11th Cir.2001); Kirkland
v. Midland Mortgage Co., 243 F.3d 1277, 1281 n. 5
(11th Cir.2001). In determining the amount in
controversy at the time the case was removed, the
Court may consider the notice of removal, as well as
other relevant evidence submitted. Williams, 269
F.3d at 1319. Conclusory allegations regarding the
jurisdictional amount, without setting forth

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2007 WL 917354 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 917354)**

underlying facts, are insufficient to meet the Defendant's burden. *Id. at 1319-20.* The Plaintiff's failure to stipulate as to the amount in controversy, that is, to the total amount of damages she is seeking in this case, is a relevant, but not dispositive consideration in determining whether the case was properly removed. *See Id. at 1320.*

*\*2* The Defendant's Notice of Removal (Doc. 1) and "Defendant's Response in Opposition to Plaintiff's Motion to Remand ..." (Doc. 12) set forth the Defendant's estimates regarding each element of Plaintiff's damages that may be considered in determining the amount in controversy: lost wages ($15,330 to $19,710), front pay or reinstatement ($8,760), punitive damages (average award $270,000, median award $300,000, with a statutory cap of $100,000), compensatory damages (average award $300,732, median award $44,000), and attorneys' fees ($40,000). The estimates are based upon information provided by the Plaintiff regarding her wages while working for the Defendant,[FN1] the Defendant's review of published jury verdicts and damages awards involving claims similar to the Plaintiff's under state and federal law over the past five years, and the Defendant's estimate that counsel for the Plaintiff would spend at least 200 hours to litigate this case through discovery and trial. The Plaintiff has not provided any evidence to contradict the Defendant's estimates, but asserts that they are too speculative to be used to determine the amount in controversy in this particular case.

> FN1. The Plaintiff asserts that the Defendant's estimates for Plaintiff's lost wages are unreliable because they do not include any estimate for mitigation of damages by replacement income. Counsel for Plaintiff admitted at the hearing, however, that the record as it stands contains no evidence that Plaintiff is employed or has earned any income that would serve to reduce her claims for lost income. Moreover, even if the Court assumes, as the Plaintiff urges, that the Plaintiff will at some point before trial become employed and her damages for lost wages will therefore be reduced, the evidence submitted by the Defendant regarding the remaining elements of damages amply serve to meet the amount in controversy requirement.

The Court appropriately considers each of the above-mentioned elements of damages in determining the amount in controversy in this case.[FN2] Even using the most conservative estimates provided by the Defendant regarding amounts involved through the date of trial, the Defendant has demonstrated that the amount in controversy more likely than not is met in this case.

> FN2. See the cases cited in the "Defendant's Memorandum of Law in Opposition to the Plaintiffs Motion to Remand ..." (Doc. 12), including *Cohen v. Office Depot, Inc.* 204 F.3d 1069, 1079 (11th Cir.2000)(attorneys' fees properly included in calculation of jurisdictional amount when statute provides for recovery of fees in case).

The Court agrees with the Plaintiff that it is inappropriate to speculate regarding the amounts of damages that she might ultimately recover in this case were a jury to render a verdict. However, the estimates provided by the Defendant are not mere conclusory allegations, and are not based on mere speculation, but are based on information provided by the Plaintiff, a review of damages awards in similar cases, and Defendant's counsel's experience regarding hours likely needed to litigate the case. Moreover, as stated above, the Plaintiff has not submitted any evidence to contradict these estimates, including the number of attorney hours likely needed to litigate the case through trial. The Court finds that the Defendant's estimates are conservative as well as reasonable in that they are calculated through a trial date estimated to be 12-18 months from the date of the filing of the Complaint, [FN3] they do not attempt to include the value of such items as the value of lost benefits, and they use an hourly rate in calculation of attorneys' fees which is actually lower that the rate charged by Plaintiffs counsel.[FN4] The Court also finds that the fact that the Plaintiff has not stipulated that she seeks less than the jurisdictional amount in this case deserves some weight. The Court is of the opinion that the Defendant has shown by a preponderance of the evidence that the amount in controversy in this case exceeds $75,000 .00, exclusive of interest and costs, and therefore the Plaintiff's Motion to Remand (Doc.7) will be denied. Accordingly, upon review of the matter, it is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 917354 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 917354)**

> FN3. The Defendant's estimate regarding the trial date is also in accordance with the proposed trial date to which the parties have agreed in their Case Management Report (Doc.9).

> FN4. The Defendant uses an estimated rate of $200.00 per hour (Doc. 1 at p. 5), and Plaintiff's counsel indicates that his rates in 2006 and 2007 were $215.00 and $225.00 per hour respectively (Doc.7, Affidavit of Plaintiff's Counsel).

**\*3ORDERED AND ADJUDGED:**

1. That Plaintiff's Motion to Remand (Doc.7) is denied; and

2. That the stay previously entered by the Court is lifted and the parties shall have until April 16, 2007, to file any amendment they deem appropriate to their Case Management Report (Doc. 9.).

**DONE AND ORDERED.**

M.D.Fla.,2007.
Alshakanbeh v. Food Lion, LLC
Not Reported in F.Supp.2d, 2007 WL 917354 (M.D.Fla.)

END OF DOCUMENT

# EXHIBIT E



Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

**H**Barbee v. U.S.
W.D.Wis.,2005.
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
Bethany BARBEE, Edward Barbee, Darlene Barbee,
Thomas Barbee, Margaret Barbee, Gladys Barbee,
Matthew Barbee, Harvey Barbee, Jane Barbee and
Bernice Williams, Plaintiffs,
andGENERAL MOTORS CORPORATION,
Intervener,
v.
UNITED STATES OF AMERICA and Mary Falk, as
Administrator and Personal Representative of the
Estate of Danielle Skatrud, Deceased, Defendants,
andANTHEM BLUE CROSS & BLUE SHIELD,
Medical Mutual, Cigna Healthcare, Kaiser
Permanente, Nationwide Insurance, Unicare Life &
Health Insurance Company, United Healthcare of
Ohio, Inc., and Allstate Insurance Company, New
Party Defendants.
**No. 05-C-249-S.**

Dec. 7, 2005.

Henry W. Chamberlain, Weisman, Kennedy & Berris
Co., L.P.A., for Plaintiffs.
Steven P. O'Connor, Assistant U.S. Attorney, Randall
Skiles, Skiles Law Office, Madison, WI, for
Defendants.
Russ J. Delury, Sharps & Associates, PSC,
Brookfield, WI, Anthony D. Conlin, Peterson,
Johnson & Murray, S.C., Amy F. Scholl, Coyne
Schultz Becker & Bauer, Madison, WI, Monte E.
Weiss, Deutch & Weiss, LLC, Whitefish Bay, WI,
for New Party Defendants.

MEMORANDUM AND ORDER FOR JUDGMENT

SHABAZ, J.
**\*1** The above entitled matter was tried to the Court at
which trial the Court determined the uncontested
facts as follows.

On October 12, 2002 plaintiff Edward Barbee was
driving a red Honda southbound on Interstate 90/94.
Plaintiff Thomas Barbee was in the front passenger
seat. Plaintiff Margaret Barbee was in the back seat
directly behind Edward Barbee. Plaintiff Darlene
Barbee was in the back seat directly behind Thomas
Barbee.

On October 12, 2002 plaintiff Matthew Barbee was
driving a Buick Le Sabre southbound on Interstate
90/94. Plaintiff Gladys Barbee was in the back seat
directly behind Matthew Barbee. Plaintiff Bernice
Williams was sitting in the middle position of the
back seat. Plaintiff Harvey Barbee was sitting in the
backseat directly behind the passenger seat.

At that same time an Acura driven by Danielle
Skatrud was traveling in the northbound lanes of
traffic on Interstate 90/94. She had two passengers in
her vehicle Jeremy LaRoche and Justin Vandre.
Another vehicle driven by an employee of the United
States was also traveling northbound on Interstate
90/94. An accident occurred between the Skatrud
vehicle and the vehicle driven by the United States
employee. The Court previously determined both
Danielle Skatrud and the United States employee
were negligent in the operation of their vehicles.
Danielle Skatrud was found to be 70% negligent and
the United States employee was found to be 30%
negligent.

As a result of the accident between the Skatrud
vehicle and the United States vehicle plaintiff
Edward Barbee's vehicle was struck on the left front
corner by the Skatrud vehicle after she drove through
the median and hit his vehicle. As a result of this
collision Edward Barbee's vehicle skidded and then
went into one full lateral "barrel-roll" it landed on its
wheels and then skidded another 50 -75 feet before it
came to rest.

After hitting Edward Barbee's vehicle the Skatrud
vehicle hit the Buick Le Sabre driven by Matthew
Barbee head on. The Skatrud vehicle broke into three
large pieces as a result of these collisions. The Buick
Le Sabre suffered extensive front-end damage.

The parties stipulated regarding liability and the case
proceeded as a damages only trial.

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

The medical records and expenses of plaintiffs were authentic and required no further foundation witnesses.

*Plaintiff Bernice Williams*

In addition to the above stated uncontested facts the Court determines the uncontested facts concerning Bernice Williams as follows:

Bernice Williams was last employed at Elyria Memorial Hospital on October 10, 2002. She worked in the environmental health services department for 22 years.

Bernice Williams was injured in the October 12, 2002 collision. She sustained a left posterior hip dislocation with transverse wall acetabulum fracture and a ligament tear of the left thumb. The fracture dislocation of the left hip led to a condition called avascular necrosis of the femoral head. Bernice Williams also suffered nerve damage. The nerve damage was associated with her hip injury.

**\*2** Bernice Williams underwent a closed reduction of her left hip and acetabular fracture on October 12, 2002. She was placed in skeletal traction for three days post surgery.

Bernice Williams underwent operative and internal fixation for her left transverse posterial wall acetabular fracture on October 15, 2002.

Another surgery was performed on October 23, 2002 to repair the left thumb ligament damage.

Bernice Williams was confined in a Wisconsin hospital from October 12, 2002 through October 26, 2002. At that point she was transferred to Cleveland, Ohio.

Bernice Williams was then confined in Ohio at Elyria Memorial Hospital in Elyria, Ohio from October 26, 2002 through October 29, 2002. After three days of stabilization she was then transferred to a rehabilitation hospital where she was confined from October 29, 2002 through November 9, 2002. The name of the rehabilitation hospital was Lorain County Health Partners.

Bernice Williams has suffered significant past physical and mental pain and suffering, disability and scarring. Her scarring is located bilaterally on her lower extremities, on her right hip, on her left thumb and on the top of her hand.

Bernice Williams has undergone extensive surgeries in the past as well as extensive medical care and treatment as a direct and proximate result of the October 12, 2002 collision.

The entirety of Bernice Williams' medical expenses are reasonable and necessary to have incurred as a direct and proximate result of the October 12, 2002 collision. However, Bernice Williams does not know what she paid out-of-pocket for her medical expenses.

Allstate Insurance Company issued a policy of insurance identified as policy number 626573328 to Bernice Williams and said policy was in full force and effect at the time of the October 12, 2002 collision.

Bernice Williams is 48 years old and her average life expectancy is approximately another 28.8 years.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Bernice Williams: she incurred a total of $104,214.53 in medical expenses. Allstate Insurance Company proved its subrogation interest in the amount of $15,005.48 concerning Bernice Williams. Accordingly, she sustained $89,209.05 in damages for her past medical expenses.

In terms of future medical expenses the Court finds she will require left hip replacement surgery in the future. As a result of her hip replacement surgery she will require physical therapy, home health care, post-operative medical visits and post-operative pain medication. It is necessary to award damages for future medical expenses concerning her future left hip surgery in the amount of $33,831.58. An award of future medical expenses for thumb surgery has not been proven. Exhibit 115 is the life care plan for Bernice Williams created by Ms. Boeing who testified she was informed that Bernice Williams may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

require future surgery on her thumb. This conclusion does not meet the reasonable degree of medical certainty required to award damages for future medical expenses.

**\*3** In terms of past loss of earning capacity defendant United States of America has stipulated to the amount of $66,575.00 which is just and necessary.

In terms of future services and equipment the testimony of Ms. Boeing is credible. It is reasonable and necessary for Bernice Williams to have someone assist her with life activities which she cannot perform exclusively by herself such as grocery shopping, laundry and periodic deep cleaning. Bernice Williams currently has people assisting her with these tasks such as her friend and her son who can assist her into the future. Accordingly, when the entirety of the evidence is considered the Court finds it appropriate to award Bernice Williams damages for future services and equipment in the amount of $130,000.00. Because an award for future services and equipment is appropriate, an award for future loss of services is not necessary or reasonable and would equate to double the recovery for the same type of damages.

There is no doubt that Bernice Williams endured significant pain and suffering and will continue to endure pain and suffering into the future. Bernice Williams was one of the most injured plaintiffs in this case. Dr. Stanfield testified Bernice Williams now has arthritis in her hip because of her injuries and she will continue to suffer from pain into the future. Dr. Stanfield also testified Bernice Williams will incur significant limitations because of her injuries. The Court finds this testimony credible. Accordingly, it is reasonable and appropriate to award damages for both past pain and suffering in the amount of $250,000.00 and future pain and suffering in the amount of $100,000.00.

Bernice Williams also presented a claim for future loss of earning capacity for which the basis for said award has not been provided. Dr. Stanfield testified Bernice Williams cannot currently perform her job duties as a housekeeper and will not be able to perform those duties in the future. Such testimony supports her damages for future services and equipment. However, this testimony alone does not support an award for future loss of earning capacity.

Bernice Williams did not demonstrate that she is unable to perform any job in which she could earn what she had earned as a housekeeper. Having failed to meet this burden, damages for future loss of earning capacity cannot be awarded.

Finally, Bernice Williams presented a claim for past loss of services. No basis for this award exists. She has been taking care of herself since the accident with some assistance from her son and her friend. Bernice Williams testified she was a "neat freak" before the accident and now she just lets things happen. However, the Court finds this testimony does not support an award for past loss of services.

Accordingly, Bernice Williams sustained damages in the amount of $669,615.63 summarized as follows: past medical expenses in the amount of $89,209.05; future medical expenses in the amount of $33,831.58; past loss of earning capacity in the amount of $66,575.00; future services and equipment in the amount of $130,000.00; past pain and suffering in the amount of $250,000.00; and future pain and suffering in the amount of $100,000.00. The United States of America is liable for 30% of her damages. Accordingly, judgment will be entered in favor of plaintiff Bernice Williams against defendant United States of America in the amount of $200,884.69.

*Plaintiff Gladys Barbee*

**\*4** The Court determines the uncontested facts concerning Gladys Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Gladys Barbee suffered physical injuries and damages including: bilateral supracondylar femur fractures involving the intra articular surface with the knee joint bilaterally and a subarachnoid hemorrhage which showed an intra parenchymal hemorrhage in the right frontal lobe of her brain.

As a direct and proximate result of the October 12, 2002 collision the bilateral femur fractures necessitated surgical intervention in Madison WI, extensive physical therapy and rehabilitation. They also eventually led to the need for bilateral total knee replacements. These were performed in Elyria, Ohio.

Gladys Barbee had been hospitalized in Wisconsin from October 12, 2002 through October 25, 2002. She was then hospitalized in Elyria, Ohio from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

October 25, 2002 through October 29, 2002. Then she was transferred to a rehabilitation hospital and she stayed there from October 29, 2002 through November 9, 2002. Subsequent to these hospitalizations Gladys Barbee was also hospitalized for the removal of hardware in her right femur and a right total knee replacement at Elyria Memorial Hospital on May 28, 2003. She underwent a similar confinement on February 25, 2005 to remove the hardware from her left femur and underwent a left total knee replacement. This also occurred at Elyria Memorial Hospital.

The operative reports from the University of Wisconsin Hospitals and Clinics indicate Gladys Barbee suffered from advanced degenerative arthritis of her right knee before the accident.

The operative reports from the University of Wisconsin Hospitals and Clinics indicate Gladys Barbee suffered from moderate degenerative arthritis in her left knee before the accident.

As a direct and proximate result of the October 12, 2002 collision Gladys Barbee has been hospitalized no less than five times to date.

The injuries and damages to Gladys Barbee's lower extremities have left her legs scarred.

As a direct and proximate result of the collision Gladys Barbee sustained permanent scarring on her knees, legs and forehead.

Gladys Barbee never sought treatment for her knees from Dr. Krebs before the October 12, 2002 collision.

Gladys Barbee had a left knee patellectomy (removal of her left knee cap) which was injured in a previous volleyball accident.

Gladys Barbee has suffered past physical and mental pain, suffering and disability.

The entirety of Gladys Barbee's medical expenses are reasonable and necessary to have incurred as a direct and proximate result of the October 12, 2002 collision. However, Gladys Barbee does not know how much she paid out-of-pocket for her medical expenses.

Gladys Barbee has been receiving Social Security Disability income since she was found to be permanently and totally disabled after she suffered a work related back injury on May 29, 1997. The nerve damage in her back also caused her to suffer chronic depression. However, two hours a day seven days a week Gladys Barbee did work for a couple (Mr. and Mrs. Lewis) making lunch and administering blood sugar tests for Mrs. Lewis (who has diabetes.) Gladys Barbee was paid $8.00 per hour for her work.

**\*5** Gladys Barbee had a history of chronic headaches before the October 12, 2002 collision.

Gladys Barbee was diagnosed with a clinical brain stem cerebral vascular accident (stroke) in April of 2002.

Gladys Barbee hit her head on a garage door on July 4, 2004.

Gladys Barbee injured her left knee while riding on a transport vehicle in Las Vegas, Nevada when it stopped suddenly. She smacked her knee and suffered swelling and pain.

Gladys Barbee is 53 years old and her average life expectancy is another 24.9 years.

AllState Insurance Company issued a policy of insurance identified as policy number 092358136 to Gladys Barbee and said policy was in full force and effect at the time of the October 12, 2002 collision.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Gladys Barbee: she incurred a total of $146,105.70 in medical expenses. Allstate Insurance Company proved its subrogation interest in the amount of $10,000.00 concerning Gladys Barbee. Accordingly, she sustained $136,105.70 in damages for her past medical expenses.

In terms of past loss of earning capacity defendant United States of America stipulated to an amount of $17,520.00 which is just and necessary.

Gladys Barbee suffered significant past pain and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

suffering and will continue to endure pain and suffering into the future. The Court finds she was one of the most injured plaintiffs in the case. Dr. Krebs acknowledged Gladys Barbee had knee problems in the past. However, he testified the October 12, 2002 accident accelerated her arthritis. The Court finds this testimony credible. Further, Dr. Krebs testified Gladys Barbee's knee replacements were very constraining and she will be permanently limited in terms of the range of motion she has in her knees. Again the Court finds such testimony credible. Dr. Sese testified her poor memory, poor concentration, and forgetfulness were a direct result of the accident and he testified those symptoms will probably be a persistent problem for her. The Court finds this testimony credible. Accordingly, it is reasonable and appropriate to award damages for both past pain and suffering in the amount of $150,000.00 and future pain and suffering in the amount of $100,000.00.

Gladys Barbee also presented a claim for future medical expenses. The Court, however, does not find a basis for this award. Neither Dr. Krebs nor Dr. Sese testified Gladys Barbee will ever need future medical treatment. Both doctors testified she will incur some limitations and pain into the future. However, such testimony supports her award of damages for future pain and suffering not her claim for medical expenses. Neither doctor testified she will need medical treatment at any point in the future. In fact Dr. Krebs testified there is no way to know whether she will ever require future treatment for her knees. He also testified her shoulder will not be an issue for her after her recent surgery. Accordingly, the Court does not find that Gladys Barbee has met her burden to prove damages for future medical expenses.

**\*6** Gladys Barbee sustained damages in the amount of $403,625.70 summarized as follows: past medical expenses in the amount of $136,105.70; past loss of earning capacity in the amount of $17,520.00; past pain and suffering in the amount of $150,000.00; and future pain and suffering in the amount of $100,000.00. The United States of America is liable for 30% of her damages. Accordingly, judgment will be entered in favor of plaintiff Gladys Barbee against defendant United States of America in the amount of $121,087.71.

*Plaintiff Edward Barbee*

The Court determines the uncontested facts concerning Edward Barbee as follows: as of October 12, 2002 Edward Barbee was gainfully self-employed as an over-the-road truck driver. As a direct and proximate result of the October 12, 2002 collision Edward Barbee lost his ability to perform his employment activities for approximately nine months. He went back to work on or about June 18, 2003. Edward Barbee is still employed as an over-the-road truck driver.

Edward Barbee is entitled to a damage claim for loss of profits. However, the amount he is entitled to is in dispute.

As a direct and proximate result of the October 12, 2002 collision Edward Barbee suffered a large head laceration, bilateral ankle fractures and a left knee contusion. Whether or not Edward Barbee's injuries have completely healed is in dispute.

As a direct and proximate result of the October 12, 2002 collision Edward Barbee sustained permanent scarring over the anterior portion of his scalp.

As a direct and proximate result of the October 12, 2002 collision Edward Barbee had follow-up appointments with his orthopedic surgeon for his bilateral ankle fractures over several years. His last visit was in February of 2005. He also underwent physical therapy for his ankles. However, Edward Barbee never underwent surgery for his bilateral ankle fractures.

On November 14, 2002 Edward Barbee's CAT scan was negative for any brain injury.

All of the medical care and treatment Edward Barbee received was reasonable and necessary. His medical bills are reasonable and necessary as well. However, Edward Barbee does not know the amount he paid out-of-pocket for his medical expenses.

As a direct and proximate result of the October 12, 2002 collision Edward Barbee suffered from perithesias and lancinating type of pain from the scalp laceration. However, the severity of these injuries is in dispute. Whether Edward Barbee could eliminate his pain with medication is also in dispute.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Edward Barbee is 56 years old and has an average life expectancy of another 22.7 years.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Edward Barbee: he incurred a total of $16,257.74 in medical expenses. His insurers Unicare Life & Health Company and Nationwide Insurance waived any subrogation interest they may have had as it relates to Edward Barbee. Accordingly, pursuant to the collateral source rule Edward Barbee sustained $16,257.74 in damages for past medical expenses.

**\*7** In terms of past lost earning capacity it is uncontested that Edward Barbee is entitled to a damage claim for loss of profits. However, the amount is in dispute. Defendant United States of America stipulated to an amount of $17,964.00. The Court has no evidentiary basis to award any other amount. Accordingly, said amount will be provided.

In terms of past and future pain and suffering there is no question the collision of October 12, 2002 was an horrific event and as a result Edward Barbee endured significant pain and suffering. He was confined to a wheelchair for a period of time and the physical therapy regime he underwent was necessary to increase the range of movement in his ankles. Fortunately, it appears Edward Barbee has recovered from his injuries and is now able to work on his house, play with his grandchildren and continue in his occupation as an over-the-road truck driver. It is uncontested that as a direct and proximate result of the collision Edward Barbee sustained permanent scarring over the anterior portion of his scalp. Accordingly, it is appropriate to award Edward Barbee damages for past pain and suffering in the amount of $30,000.00 and damages for future pain and suffering in the amount of $20,000.00.

Edward Barbee also presented a claim for future medical expenses. This claim has not been proven to a reasonable degree of medical certainty. Dr. Sese did not suggest Edward Barbee will receive further treatment for his head laceration. Further, Dr. Palekar testified Edward Barbee may require arthoscopies on his ankles at some point but such speculative testimony does not satisfy the standard for awarding future medical expenses.

Accordingly, Edward Barbee sustained damages in the amount of $84,221.74 summarized as follows: past medical expenses in the amount of $16,257.74; past loss of earning capacity in the amount of $17,964.00; past pain and suffering in the amount of $30,000.00; and future pain and suffering in the amount of $20,000.00. The United States of America is liable for 30% of his damages. Accordingly, judgment will be entered in favor of plaintiff Edward Barbee against defendant United States of America in the amount of $25,266.52.

*Plaintiff Margaret Barbee*

The Court determines the uncontested facts concerning Margaret Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Margaret Barbee's injuries included: a right ankle fracture, nasal and orbital fractures, corneal abrasion, multiple rib fractures, scarring and a left-scapular fracture.

Margaret Barbee's orthopedic injuries of her right ankle fracture, left second metatarsal shaft fracture and displaced left scapular fracture all required orthopedic attention and/or treatment. These injuries as well as Margaret Barbee's rib fractures were caused by the October 12, 2002 collision.

As a direct and proximate result of the October 12, 2002 collision Margaret Barbee underwent a closed reduction of her right ankle on October 12, 2002. These injuries required a confinement in a Wisconsin hospital from October 12, 2002 through October 21, 2002. She was then transferred to Cleveland and she was confined at Lorain Community Hospital Rehabilitation Center from October 21, 2002 through October 25, 2002.

**\*8** Margaret Barbee testified at her deposition that she suffers from chronic sinus disease.

All of Margaret Barbee's psychiatric and psychological care and treatment was related to the October 12, 2002 collision. Her psychiatric and psychological bills are reasonable and were necessary for her care and treatment.

Margaret Barbee's medical expenses are reasonable in amount and were necessary for her treatment. They

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are also a direct and proximate result of the October 12, 2002 collision. However, Margaret Barbee does not know how much she paid out-of-pocket for her medical expenses.

Margaret Barbee is employed as a case manager supervisor for Western Reserve Agency on Aging. She sustained lost wages as a result of the October 12, 2002 collision.

Margaret Barbee sustained her lost wages during the period of October 2002 through approximately January of 2003.

Margaret Barbee was able to resume her everyday activities by the end of 2002. Additionally, Margaret Barbee's doctors have not placed any limitations on her physical activities.

Margaret Barbee is 55 years old and has an average life expectancy of another 23.4 years.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Margaret Barbee: she incurred a total of $39,980.23 in medical expenses. Intervener General Motors Corporation proved its interest in the amount of $33,132.93 concerning expenses incurred on behalf of Margaret Barbee. Nationwide Insurance has waived any subrogation interest it may have had concerning Margaret Barbee. Accordingly, she sustained $6,847.30 in damages for past medical expenses.

Damages in the amount of $13,059.96 for past loss of earnings are reasonable and necessary. Exhibit 121 is a letter from Pamela Tatum who is a human resources assistant at Western Reserve Area Agency on Aging where Margaret Barbee is employed. This credible evidence demonstrates the total amount of economic loss Margaret Barbee suffered as a result of the October 12, 2002 collision to be $13,059.96.

Again there is no question the collision of October 12, 2002 was an horrific event to witness and experience, causing Margaret Barbee pain and suffering. Fortunately, Margaret Barbee has recovered. Dr. Truehaft has not imposed any restrictions on her activities as a result of her physical injuries and Dr. Spencer testified that she has achieved the goals of her therapy. However, it is uncontested that Margaret Barbee sustained some scarring as a result of her injuries. Accordingly, an award for past pain and suffering in the amount of $20,000.00 and an award of $5,000.00 for future pain and suffering is appropriate.

Margaret Barbee sustained damages in the amount of $44,907.26 summarized as follows: past medical expenses in the amount of $6,847.30; past loss of earnings in the amount of $13,059.96; past pain and suffering in the amount of $20,000.00; future pain and suffering in the amount of $5,000.00. The United States of America is liable for 30% of her damages. Accordingly, judgment will be entered in favor of plaintiff Margaret Barbee against defendant United States of America in the amount of $13,472.18.

*Plaintiff Harvey Barbee*

**\*9** The Court determines the uncontested facts concerning Harvey Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Harvey Barbee suffered injuries which included: a kidney contusion, a chest wall injury, abrasions, scarring and a neck sprain. The amount of time it took for Harvey Barbee's injuries to heal is in dispute.

As a direct and proximate result of the October 12, 2002 collision Harvey Barbee suffered permanent scarring of his neck, chest and pelvis.

Harvey Barbee has degenerative disc disease in his spine at C5-C6 and C6-C7.

Harvey Barbee sustained past physical and mental pain, suffering and disability.

The medical expenses submitted by Harvey Barbee are reasonable in amount and were necessary for his therapy. Harvey Barbee does not know the amount he paid out-of-pocket for his medical expenses.

The medical care and treatment provided to Harvey Barbee was reasonable and necessary.

Harvey Barbee is 50 years old and has an average life expectancy of another 27.3 years.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Allstate Insurance Company issued a policy of insurance identified as policy number 092222355 to Harvey Barbee and said policy was in full force and effect at the time of the October 12, 2002 collision.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Harvey Barbee: he incurred a total of $17,533.64 in medical expenses. Allstate Insurance Company proved its subrogation interest in the amount of $10,385.00 concerning Harvey Barbee. Accordingly, he sustained $7,148.64 in damages for past medical expenses.

Past and future pain and suffering resulted from the horrible collision of October 12, 2002. Dr. Huey testified Harvey Barbee suffered an extensive hematoma that started at the right side of his neck and it extended down into his chest wall. He also suffered a painful burn from his seat belt. Dr. Huey testified Harvey Barbee will have a scar from his seat belt for the rest of his life. Dr. Huey's testimony is credible and an award of damages in the amount of $50,000.00 for past pain and suffering and $25,000.00 for future pain and suffering is reasonable and necessary.

Accordingly, Harvey Barbee sustained damages in the amount of $82,148.64 summarized as follows: past medical expenses in the amount of $7,148.64; past pain and suffering in the amount of $50,000.00; and future pain and suffering in the amount of $25,000.00. The United States of America is liable for 30% of his damages. Accordingly, judgment will be entered in favor of plaintiff Harvey Barbee against defendant United States of America in the amount of $24,644.59.

*Plaintiff Matthew Barbee*

The Court determines the uncontested facts concerning Matthew Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Matthew Barbee sustained a right toe injury and ligament damage to the extensor tendon to his right big toe.

**\*10** Matthew Barbee's first joint of his right big toe had also been disrupted and damaged. He needed to undergo surgery to repair those injuries.

As a result of the October 12, 2002 collision Matthew Barbee sustained bilateral knee injuries.

Matthew Barbee also sustained a right thumb injury and he sustained ligament damage to his right thumb. Both of these injuries required orthopedic treatment.

For a period of time Matthew Barbee could not straighten out or lift his big toe because of his ligament and tendon damage. Dr. Palekar performed surgery to correct this.

Matthew Barbee testified at his deposition that the injuries he suffered as a result of the October 12, 2002 collision do not create problems with his ordinary activities.

As a direct and proximate result of the October 12, 2002 collision Matthew Barbee suffered past physical and mental pain, suffering and disability.

Matthew Barbee's medical expenses are reasonable in amount and were necessary for the treatment of the injuries he suffered as a result of the October 12, 2002 collision.

Allstate Insurance Company issued a policy of insurance identified as policy number 092358136 to Matthew Barbee and said policy was in full force and effect at the time of the October 12, 2002 collision.

Matthew Barbee is 31 years old and has an average life expectancy of another 42.8 years.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Matthew Barbee: he incurred a total of $17,589.82 in medical expenses. Allstate Insurance Company proved its subrogation interest in the amount of $6,064.25 concerning Matthew Barbee. United Healthcare of Ohio, Inc. waived any subrogation interest it may have had concerning Matthew Barbee. Accordingly, he sustained $11,525.57 in damages for past medical expenses.

Past loss of earning capacity in the amount of $9,120.00 has been stipulated to by defendant United States of America.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 9
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

The Court finds the collision was a terrible event to endure and as a result thereof Matthew Barbee will have a permanent scar. Said plaintiff testified he still lifts weights, plays football, plays some softball and is not in much pain on a day to day basis. His testimony was most credible. Accordingly, the Court finds an award in the amount of $40,000.00 for past pain and suffering and $10,000.00 for future pain and suffering is reasonable and appropriate.

Matthew Barbee also presented a claim for future medical expenses. The Court does not find a basis for such an award. Dr. Palekar testified that any surgery that Matthew Barbee may require may not be necessary for another 30-40 years. This does not satisfy the reasonable degree of medical certainty required to award damages for future medical expenses.

Accordingly, Matthew Barbee sustained damages in the amount of $70,645.57 summarized as follows: past medical expenses in the amount of $11,525.57; past loss of earning capacity in the amount of $9,120.00; past pain and suffering in the amount of $40,000.00; and future pain and suffering in the amount of $10,000.00. The United States of America is liable for 30% of his damages. Accordingly, judgment will be entered in favor of plaintiff Matthew Barbee against defendant United States of America in the amount of $21,193.67.

*Plaintiff Thomas Barbee*

**\*11** The Court determines the uncontested facts concerning Thomas Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Thomas Barbee suffered a left knee posterior cruciate ligament tear, right finger fracture, sternal fracture and he currently suffers from knee problems.

Thomas Barbee suffered from a right middle finger mallot injury and he suffered radial digital nerve damage.

Thomas Barbee's sternal fracture was non-displaced. His treatment was limited to pain medication.

Dr. Serna did not impose any restrictions on Thomas

Barbee when he discharged him from treatment on January 17, 2003.

Thomas Barbee suffered past physical and mental pain, suffering and disability.

Thomas Barbee's medical expenses are reasonable in amount and were necessary for his medical care and treatment of the injuries he sustained in the October 12, 2002 collision. However, Thomas Barbee does not know how much he paid out-of-pocket for his medical expenses.

Thomas Barbee's wage loss claim is reasonable in amount.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Thomas Barbee: he incurred a total of $16,079.30 in medical expenses. The Court finds intervener General Motors Corporation proved its interest in the amount of $1,190.19 concerning expenses incurred on behalf of Thomas Barbee. Nationwide Insurance waived any subrogation interest it may have had concerning Thomas Barbee. Accordingly, he sustained $14,889.11 in damages for past medical expenses. The parties stipulated to the amount of $420.00 for loss of earnings.

Finally, in terms of pain and suffering again there is no question Thomas Barbee endured past pain and suffering as a result of the October 12, 2002 collision. It was an horrific event and he was injured. Accordingly, the Court finds an award for past pain and suffering in the amount of $50,000.00 has been proven. However, no evidence exists to award damages for future pain and suffering. It is undisputed that Thomas Barbee currently suffers from knee problems. However, no evidence was presented to a reasonable degree of medical certainty that Thomas Barbee will continue to suffer from knee problems into the future. Dr. Serna testified concerning Thomas Barbee's knee problems as of January of 2004. Such testimony does not meet the burden required to award future pain and suffering damages.

Accordingly, Thomas Barbee sustained damages in the amount of $65,309.11 summarized as follows: past medical expenses in the amount of $14,889.11;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

past loss of earnings in the amount of $420.00; past pain and suffering in the amount of $50,000.00. The United States of America is liable for 30% of his damages. Accordingly, judgment will be entered in favor of plaintiff Thomas Barbee against defendant United States of America in the amount of $19,592.73.

*Plaintiff Darlene Barbee*

**\*12** The Court determines the uncontested facts concerning Darlene Barbee as follows: as a direct and proximate result of the October 12, 2002 collision Darlene Barbee suffered right knee pain and torn ligaments, a left ankle sprain and torn ligaments and scarring to her right knee. As a result of the October 12, 2002 collision Darlene Barbee sustained a torn medial meniscus of her right knee which included a sprain of ligaments in that knee. However, the amount of time it took for those injuries to heal is in dispute.

As a direct and proximate result of the October 12, 2002 collision Darlene Barbee also suffered torn lateral ligaments of her left ankle.

Both Darlene Barbee's ankle and knee injuries required physical therapy to address the injuries and damages sustained in her joints. The therapy was reasonable.

Repeat MRI scans of the right knee conducted in February of 2005 showed findings consistent with damage to the collateral ligament of the knee as was previously diagnosed.

Darlene Barbee has not been told by any doctor that she will need future medical treatment for the injuries she suffered in the October 12, 2002 collision. She also testified at her deposition that the injuries she suffered in the October 12, 2002 collision do not prevent her from engaging in any activity she chooses to partake in currently.

The orthopedic treatment rendered to Darlene Barbee's right knee was reasonable and necessary.

As a result of the October 12, 2002 collision Darlene Barbee suffered past physical and mental pain, suffering and disability.

Darlene Barbee's medical expenses are reasonable in amount and were necessary to treat the injuries she suffered in the October 12, 2002 collision. However, Darlene Barbee does not know how much she paid out-of-pocket for her medical expenses.

Darlene Barbee is 54 years old and has an average life expectancy of another 24.2 years.

In addition to the uncontested facts stated above, as a result of trial the Court determines the following findings of fact and conclusions of law concerning Darlene Barbee: she incurred a total of $11,053.65 in medical expenses. Kaiser Permanente proved its subrogation interest in the amount of $5,965.16. Nationwide Insurance waived any subrogation interest it may have had concerning Darlene Barbee. Accordingly, she sustained $5,088.49 in damages for past medical expenses.

There is no question Darlene Barbee endured pain and suffering as a result of the October 12, 2002 collision. It was a terrible collision and she was injured. Fortunately for the plaintiff, Dr. Palekar was able to discharge her from treatment in March of 2003 and did not impose any restrictions on her activities. However, it is undisputed that Darlene Barbee sustained scarring to her right knee as a result of the injuries she suffered in the collision. Accordingly, an award of damages in the amount of $45,000.00 for past pain and suffering and $5,000.00 for future pain and suffering is appropriate.

**\*13** Accordingly, Darlene Barbee sustained damages in the amount of $55,088.49 summarized as follows: past medical expenses in the amount of $5,088.49; past pain and suffering in the amount of $45,000.00; and future pain and suffering in the amount of $5,000.00. The United States of America is liable for 30% of her damages. Accordingly, judgment will be entered in favor of plaintiff Darlene Barbee against defendant United States of America in the amount of $16,526.55.

The Court further finds that defendant United States of America did not meet its burden to prove the affirmative defense that plaintiffs Edward Barbee, Gladys Barbee and Bernice Williams negligently contributed to their injuries by failing to wear their seat belts. The Court balances the evidence presented

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and determines there was not enough credible evidence to support such a defense. Accordingly, the judgment entered in favor of plaintiffs Edward Barbee, Gladys Barbee and Bernice Williams will not be reduced.

*Intervener General Motors Corporation*

Intervener General Motors Corporation sustained damages in the amount of $34,323.12. Defendant United States of America is liable for 30% of the damages which amounts to $10,296.94. Judgment will be entered in said amount. The evidence submitted without objection supports said award.

*Anthem Blue Cross & Blue Shield*

Anthem Blue Cross & Blue Shield waived any subrogation interest it may have had in this action by failing to respond to the complaint or otherwise participate in the prosecution of this action.

*Medical Mutual*

Medical Mutual waived any subrogation interest it may have had in this action by failing to respond to the complaint or otherwise participate in the prosecution of this action.

*Cigna Healthcare*

Cigna Healthcare waived any subrogation interest it may have had in this action by failing to respond to the complaint or otherwise participate in the prosecution of this action.

*Kaiser Permanente*

Subrogated insurer Kaiser Permanente sustained damages in the amount of $5,965.16. Defendant United States of America is liable for 30% of the damages which amounts to $1,789.55. Judgment will be entered in said amount. The evidence submitted without objection supports said award.

*Nationwide Insurance*

Nationwide Insurance waived any subrogation interest it may have had in this action by agreeing to be bound by the terms of the judgment entered in its favor against defendant United States of America in case number 04-C-729-S.

*Unicare Life & Health Insurance Company*

Unicare Life & Health Insurance Company waived any subrogation interest it may have had in this action.

*United Healthcare of Ohio*

United Healthcare of Ohio waived any subrogation interest it may have had in this action.

*Allstate Insurance Company*

Subrogated insurer Allstate Insurance Company sustained damages in the amount of $41,454.73. Defendant United States of America is liable for 30% of the damages which amounts to $12,436.42. Judgment will be entered in said amount. The Court finds the evidence submitted without objection supports said award.

**\*14** No basis exists in this action to award $200,000.00 to Allstate Insurance Company which it previously paid the sum of $100,000.00 to plaintiff Bernice Williams and the sum of $100,000.00 to plaintiff Gladys Barbee. Had Allstate acted pursuant to a mistake of fact the proper course of action is to pursue recovery in a separate action.

*Estate of Danielle Skatrud and Wisconsin Mutual Insurance Company*

The Estate of Danielle Skatrud deposited the policy limits of the Wisconsin Mutual Insurance Company policy in the amount of $75,000.00 with the Clerk of Court. Pursuant to stipulation of the parties the $75,000.00 was to be distributed among the various claimants. Accordingly, it is distributed on a pro-rated basis as follows:

Plaintiff Bernice Williams: $29,915.31

Plaintiff Gladys Barbee: $18,032.12

Plaintiff Edward Barbee: $3,762.64

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 13
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

therein with prejudice.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant United States of America against subrogated insurer Nationwide Insurance dismissing its complaint in case number 05-C-249-S and all claims contained therein with prejudice.

IT IS FURTHER ORDERED that the Clerk of Court for the United States District Court for the Western District of Wisconsin shall distribute no sooner than December 20, 2005 the sum of $29,915.31 to plaintiff Bernice Williams; $18,032.12 to plaintiff Gladys Barbee; $3,762.64 to plaintiff Edward Barbee; $2,006.25 to plaintiff Margaret Barbee; $3,670.02 to plaintiff Harvey Barbee; $3,156.12 to plaintiff Matthew Barbee; $2,917.71 to plaintiff Thomas Barbee; $2,461.10 to plaintiff Darlene Barbee; $1,553.40 to intervener General Motors Corporation; $246.48 to subrogated insurer Kaiser Permanente; and $1,852.00 to subrogated insurer Allstate Insurance Company.

IT IS FURTHER ORDERED that the Clerk of Court for the United States District Court for the Western District of Wisconsin shall distribute no sooner than December 20, 2005 the sum of $3,974.57 to Faith Donley and $1,452.28 to Nationwide Mutual Fire Company for judgments entered in their favor in case number 04-C-729-S.

W.D.Wis.,2005.
Barbee v. U.S.
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 21276425 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21276425)**

**H**In re Rezulin Products Liability Litigation
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re: REZULIN PRODUCTS LIABILITY
LITIGATION (MDL No. 1348)
**No. MDL 1348, 00 Civ. 2843(LAK).**

June 2, 2003.

PRETRIAL ORDER NO. 150

KAPLAN, J.
**\*1** This Document Relates to: 02 Civ. 6812(LAK)

(Motions to Remand-*Lusteck* )

This action was brought in a Mississippi state court, removed to federal court on the basis of diversity notwithstanding the presence of a non-diverse physician defendant, and transferred to this Court. Plaintiff moves to remand on the ground that the physician defendant deprives the Court of complete diversity.

The complaint against the physician is for medical malpractice (count II) and breach of express and implied warranty that Rezulin was safe and effective (counts V and VI). Counts V and VI are asserted also against the drug's manufacturer. The alleged malpractice was the physician's alleged negligent failures to (1) conduct liver and cardiac monitoring even after physicians were warned of the risk of liver and cardiac damage, (2) warn plaintiff of the risks associated with Rezulin and (3) diagnose plaintiff's liver dysfunction in time to prevent irreparable injury. (Cpt ¶¶ 26-28)

Magistrate Judge Katz, in a report and recommendation dated April 28, 2003, concluded that plaintiff had no meaningful possibility of success against the doctor on counts V, VI, and the failure to warn and monitor claims in count II, but thought the failure to diagnose malpractice claim sufficient, albeit misjoined with the claims against the manufacturers

and other defendants in this case. He therefore recommended severance and remand of the malpractice claim to the state court, that the doctor be dropped as a defendant here, and that the motion to remand otherwise be denied. Plaintiff objects, arguing that the physician was joined properly, that the sufficiency of the malpractice claim against him destroys diversity, that the physician in any case did not join in the removal as required, and that the entire action therefore should be remanded.

Everything turns on the propriety of the joinder of the physician. The malpractice claim here is based in substance on the physician's failure to diagnose plaintiff's alleged liver dysfunction. The breach of warranty and other claims go principally to the safety and efficacy of the drug and have little if anything to do with the malpractice claim. For the reasons set forth by the Magistrate Judge, the joinder of the malpractice claim with the others was inappropriate because the claims do not both involve common questions of law or fact and assert "joint, several, or alternative liability ... arising from the same transaction, occurrence, or series of transactions or occurrences."Fed.R.Civ.P. 20. *Accord, e.g., Lee v. Mann,* 2000 WL 724046, at \*2 (Va.Cir.Ct. Apr. 5, 2000) (claims against drug manufacturer and malpractice claim against prescribing physician did "not arise out of the 'same transaction or occurrence' "). Plaintiff has no meaningful prospect of success on the other claims against the physician.

Accordingly, the Court adopts the report and recommendation of the Magistrate Judge. The motion to remand is granted to the extent, and only to the extent, that Count II of the complaint is severed and remanded to the Court from which it was removed. Dr. Evans is dropped as a defendant on the balance of the complaint. The motion to remand is denied in all other respects.

**\*2** SO ORDERED.

S.D.N.Y.,2003.
In re Rezulin Products Liability Litigation
Not Reported in F.Supp.2d, 2003 WL 21276425

Not Reported in F.Supp.2d                                                                                Page 2
Not Reported in F.Supp.2d, 2003 WL 21276425 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21276425)**


(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3336504 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3336504)**

Page 12

Plaintiff Margaret Barbee: $2,006.25

Plaintiff Harvey Barbee: $3,670.02

Plaintiff Matthew Barbee: $3,156.12

Plaintiff Thomas Barbee: $2,917.71

Plaintiff Darlene Barbee: $2,461.10

Intervener General Motors Corporation: $1,553.40

Subrogated Insurer Kaiser Permanente: $246.48

Subrogated Insurer Allstate Insurance Company: $1,852.00

Plaintiff Faith Donley from case number 04-C-729-S: $3,974.57

Plaintiff Nationwide Mutual Fire Company

from case number 04-C-729-S: $1,452.28

ORDER

IT IS ORDERED that judgment be entered in favor of plaintiff Bernice Williams against defendant United States of America in the amount of $200,884.69 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Gladys Barbee against defendant United States of America in the amount of $121,087.71 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Edward Barbee against defendant United States of America in the amount of $25,266.52 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Margaret Barbee against defendant United States of America in the amount of $13,472.18 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Harvey Barbee against defendant United States of America in the amount of $24,644.59 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Matthew Barbee against defendant United States of America in the amount of $21,193.67 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Thomas Barbee against defendant United States of America in the amount of $19,592.73 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff Darlene Barbee against defendant United States of America in the amount of $16,526.55 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of intervener General Motors Corporation against defendant United States of America in the amount $10,296.94 of with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of subrogated insurer Kaiser Permanente against defendant United States of America in the amount of $1,789.55 with costs.

**\*15** IT IS FURTHER ORDERED that judgment be entered in favor of subrogated insurer Allstate Insurance Company against defendant United States of America in the amount of $12,436.42 with costs.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant United States of America against subrogated insurer Anthem Blue Cross & Blue Shield dismissing its complaint and all claims contained therein with prejudice.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant United States of America against subrogated insurer Medical Mutual dismissing its complaint and all claims contained therein with prejudice.

IT IS FURTHER ORDERED that judgment be entered in favor of defendant United States of America against subrogated insurer Cigna Healthcare dismissing its complaint and all claims contained

# EXHIBIT G



In re Baycol Products Litigation
D.Minn. 2003.
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.
In re: BAYCOL PRODUCTS LITIGATION.
Nanette LOWE,
v.
BAYER et al.
ORA LEE WASHINGTON,
v.
BAYER et al.
**MDL No. 1431 (MJD/JGL)**
**Civil Case No. 03-3150**
**Civil Case No. 03-3151**

December 15, 2003.

MEMORANDUM AND ORDER

**\*1** This Document also relates to:

Carol E. Rhodes, Rhodes Law Offices, for and on behalf of Plaintiffs.

William F. Goodman Ill, Rebecca Wiggs, and C. Alleen McClain, Watkins & Eager PLLC, for and on behalf of Bayer Corporation.

Joshua J. Wiener, Butler Snow O'Mara Stevens & Cannada, for and on behalf of SmithKline Beecham Corporation d/b/a GlaxoSmithKline.

This matter is before the Court upon Plaintiffs' Motions for Remand to the Circuit Court of Jefferson County, Mississippi. Defendants oppose the motions, arguing that this Court has diversity jurisdiction over Plaintiffs' claims.

**I. BACKGROUND**

These cases were originally filed in Mississippi state court, and both Plaintiffs are citizens of the state of Mississippi. The complaints are virtually identical, with only the applicable names and dates being different in each complaint. Therefore, any citations to the complaint will include the identical paragraphs in both complaints, unless otherwise noted. Plaintiffs allege that they were prescribed Baycol and suffered permanent injuries; mental, emotional, and physical pain and suffering; worry, depression, anxiety, and psychological problems; loss of income and earning capacity; and loss of vitality and capacity to enjoy life as a result of taking the drug. (Compl. ¶¶ 351, 81, 89.) Plaintiffs have asserted a number of claims against Defendants Bayer and GlaxoSmithKline. Plaintiffs have also asserted claims against their treating physicians.

Defendants timely removed this action to the United States District Court, District of Mississippi asserting subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). In the removal petition, Defendants asserted that the non-diverse defendants, Plaintiffs' treating physicians, were fraudulently joined. Subsequently, these matters were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

**II. STANDARD**

Remand to state court is proper if the district court lacks subject matter jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). In reviewing a motion to remand, the court must resolve all doubts in favor of remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. See In re Business Men's Assurance Co. of America, 992 F.2d 181, 183 (8th Cir. 1983) (citing Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3rd Cir. 1987), cert. dismissed 484 U.S. 1021 (1988)). In determining the propriety of remand, the Court must review the plaintiffs' pleadings as they existed at the time of removal. See Pullman Co. v. Jenkins, 305 U.S. 534, 537 (1939); Crosby v. Paul Hardeman, Inc., 414 F.2d 1, 3 (8th Cir. 1969).

**\*2** "Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 23305516 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23305516)**

supporting a claim against the resident defendants." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2001) (citation omitted). The burden is on the removing party to show that there is no possibility that the plaintiff will be able to state a cause of action against the resident defendant. *See Masepohl v. American Tobacco Co., Inc.*, 974 F. Supp. 1245, 1250 (D. Minn. 1997). In deciding this issue, the Court may consider the pleadings and supporting affidavits. *See Parnas v. General Motors Corp.*, 879 F. Supp. 91, 92 (E.D. Mo. 1995).

## III. DISCUSSION

Plaintiffs have asserted a number of claims against Bayer and Glaxo ("Defendants") based on strict liability, negligence, misrepresentation, fraud, and breach of implied and express warranties. (Compl. ¶¶ 34-73.) Generally, the claims against Defendants are based on allegations that Baycol was unsafe and in an unreasonably dangerous condition when marketed; that Defendants knew Baycol was unsafe; that Defendants failed to adequately warn of Baycol's risks; that Defendants failed to conduct proper testing of Baycol; and that Defendants made false statements to physicians and the public regarding Baycol's safety. (*Id.*) Plaintiff Washington also asserts negligence claims against her physician, Dr. McArthur; and Plaintiff Lowe asserts identical claims against her physician, Dr. Bills. (Compl. ¶¶ 74-89.)

Defendants argue that the main thrust of Plaintiffs' complaints is that Defendants misrepresented the safety of Baycol, and failed to warn of the serious risks associated with Baycol when manufacturing and selling the drug. Thus, according to Defendants, Plaintiffs have failed to sufficiently plead either that their physicians proximately caused Plaintiffs' injuries, or that the physicians knew or should have known of Baycol's risks. In addition, Defendants aver that Plaintiffs have failed to provide a sufficient factual basis for their allegations that the physicians did not perform the appropriate testing recommended by Defendants. Having failed to alleged a cause of action against the physicians, Defendants assert that the physicians' joinder in this case was fraudulent. For support, Defendants cite, *inter alia,* another case decided in conjunction with this MDL, *Spier v. Bayer Corp.*, No. 02-4835, 2003 WL 21223842 (D. Minn. May 27, 2003). In *Spier*, this Court concluded that since the complaint alleged that Bayer failed to

properly represent Baycol's safety and failed to adequately warn physicians of Baycol's risks, the plaintiff failed to demonstrate that her physician know or should have known of Baycol's risks. *See Spier*, 2003 WL 21223842, at *2. This Court found that the plaintiff s physician had been fraudulently joined, and denied the plaintiffs motion to remand to state court. *Seeid.* The Court finds that the complaints in the instant cases suffer from the same deficiencies as the complaint in *Spier*.

**\*3** Plaintiffs assert that their physicians violated the appropriate standard of care in the following ways:

A. Failing to conduct adequate pre-clinical testing, post-marketing surveillance, and blood tests to determine the safety of Baycol;

B. Negligently or carelessly prescribing Baycol;

C. Failing to warn or inform [Plaintiffs] prior to or during [their] use of Baycol … about the … risks and/or side effects, of which these Defendant [physicians] knew or should have known;

D. The need for comprehensive, regular monitoring to ensure discovery of potentially serious side effects;

E. The possibility of dying or becoming disabled as a result of the drug's use and/or having to undergo surgery to correct kidney damage that [sic];

F. That Rhabdomyolysis may result in permanent injuries.

(Compl. ¶ 77.) Plaintiffs also assert that their physicians did not perform "adequate and/or subsequent lab tests recommended by the manufacturers of Baycol," did not properly monitor Plaintiffs' Baycol use, and were "otherwise careless or negligent in other material respects to be shown at trial."(*Id.* ¶¶ 79, 80, 88.)

The vast majority of Plaintiffs' complaints, however, support the position that the manufacturers concealed Baycol's risks, and that the physicians did not know those risks prior to prescribing the drug. The complaints state, *inter alia,* that

Drug Company Defendants knew, or should have

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 23305516 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23305516)**

known, that unreasonably dangerous risks were associated with the use of [Baycol] … and permitted [Baycol] to be promoted and sold without adequate warnings of the serious side effects and dangerous risks to the consuming public.

Drug Company Defendants … failed to advise or adequately warn the public, doctors, hospitals, or clinics that there were special risks associated with the use of Baycol.

Drug Company Defendants engaged in, and conspired together, to defraud and deceive Plaintiff[s] and [their] prescribing physician[s], pharmacist and members of the general public.

Drug Company Defendants engaged in a fraudulent advertising, marketing and distribution scheme … directed at Plaintiff[s], [their] prescribing physician [s], pharmacist[s] and the general public.

Drug Company Defendants … falsely and fraudulently represented to physicians … and members of the general public, that the drug was in fact safe and not unreasonably dangerous to its users.

Drug Company Defendants … failed to inform and advise Plaintiff[s] [and their] prescribing physician[s] … that the side effects of rhabdomyolysis and renal failure were known prior to approval of the drug.

Drug Company Defendants … failed to emphasi[ze] to Plaintiffs [and their] prescribing physician[s] … that patients with pre-existing kidney problems should not take Baycol and that there was no reliable way to protect them.

**\*4** Drug Company Defendants … failed to advise Plaintiff[s] [and their] prescribing physician[s] … prior to June 2001 that taking higher starting dosages of Baycol created a substantially higher risk of rhabdomyolysis and renal failure.

Drug Company Defendants, with the intent to deceive and defraud Plaintiff[s] and [their] prescribing physician[s] … fraudulently … represented that the drug Baycol had side effects comparable to placebo when, in fact, clinical trials … revealed that patients who took Baycol had an incidence of muscle pain almost seven times higher

… and joint pain almost four times higher than patients given placebos.

Drug Company Defendants … falsely promoted Baycol to Plaintiff[s] [and their] prescribing physician[s] … as a drug whose safety was backed up by clinical tests. The Drug Company Defendants … further fraudulently failed to inform Plaintiff[s] [and their] prescribing physician[s] … that since January 2000, over 100 fatalities were linked to the use of Baycol.

Plaintiff[s] and [their] prescribing physician[s] had a right to rely on such statements, representations, omissions, advertisements or promotional schemes which were material to the decision to take or prescribe Baycol and, [their] prescribing physician[s] would not have prescribed it, if [they] had known that said statements … were deceptive, false, incomplete, misleading, and untrue.

(Compl. ¶¶ 53, 55, 65, 66, 69(C), 69(D), 69(E), 69(F), 69(H), 69(J), 70.)

The Court finds that Plaintiffs have failed to demonstrate that their physicians knew or should have known of Baycol's risks. *Spier, 2003 WL 21223842, at \*2.* A defendant cannot be held liable for failing to warn of unknown risks. Therefore, Plaintiffs' motions to remand must be denied on this basis. *Seeid.*(stating that "conclusory allegations" are insufficient to defeat a finding of fraudulent joinder).

Plaintiffs also aver that their physicians "did not perform adequate and/or subsequent lab tests recommended by the manufacturers of Baycol," and did not properly monitor Plaintiffs' Baycol use. (Compl. ¶¶ 79, 88.) The complaints never identify any specific tests or monitoring, other than "liver tests," which their physicians failed to conduct, and do not even state that Plaintiffs suffered liver problems as a result of taking Baycol. The Court also finds these conclusory allegations insufficient to defeat a finding of fraudulent joinder. The overwhelming thrust of Plaintiffs' complaints is that no one, not even their physicians, were properly informed about Baycol's risks. In addition, Plaintiffs do not even attempt to establish what tests and monitoring were required once Baycol was prescribed, and thus, have failed to establish any standard of care which their physicians allegedly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2003 WL 23305516 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23305516)**

breached. Accordingly, Plaintiffs' motions are denied.

**IT IS HEREBY ORDERED:**

**\*5** (1) Plaintiff Nannette Lowe's Motion for Remand to the Circuit Court of Jefferson County, Mississippi [Doc. No. 7 in Civil Case No. 03-3150] is DENIED; and

(2) Plaintiff Ora Lee Washington's Motion for Remand to the Circuit Court of Jefferson County, Mississippi [Doc. No. 6 in Civil Case No. 03-3151] is DENIED.

Date: _____

_____, MICHAEL J. DAVIS, United States District Court

[11 NO. 1 Andrews Class Action Litig. Rep. 17 11 NO. 1 Andrews Class Action Litig. Rep. 17 11 NO. 1 Andrews Class Action Litig. Rep. 17 11 NO. 1 Andrews Class Action Litig. Rep. 17](#)
D.Minn. 2003.
In re: BAYCOL PRODUCTS LITIGATION. Nanette LOWE, v. BAYER et al. ORA LEE WASHINGTON, v. BAYER et al.
Not Reported in F.Supp.2d, 2003 WL 23305516 (D.Minn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 21223842 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21223842)**

In re Baycol Products Litigation
D.Minn.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
In re: BAYCOL PRODUCTS LITIGATION
**No. MDL 1431(MJD), 02-4835.**

May 27, 2003.

Akim A. Anastopoulo and Samuel K. Allen, Anastopoulo Law Firm for and on behalf of Plaintiffs.
Celeste T. Jones and Andrew G. Melling, McNair Law Firm, N.A. and Gene S. Schaerr, Sidley Austin Brown & Wood LLP for and on behalf of Bayer Corporation.
DAVIS, J.
**\*1** This Document also relates to: Genevieve Spier v. Bayer Corporation et al.,

This matter is before the Court upon Plaintiff's motion for remand. Bayer Corporation ("Bayer") opposes the motions, arguing that this Court has diversity jurisdiction over Plaintiff's claims.

*Background*

Plaintiff Genevieve Spier is a citizen of the state of South Carolina. She was prescribed Baycol by Defendant Dr. Terrell Stone in February 1999; which she took until August 2001. Complaint ¶ 6. She alleges that she was injured as a result of ingesting Baycol.

Plaintiff has asserted claims against the pharmaceutical manufacturers, as well as her personal physician, Dr. Stone. Because Dr. Stone is also a citizen of the state of South Carolina, this action was originally filed in state court. Bayer Corporation timely removed this action to the United States District Court, District of South Carolina asserting subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). In its removal petition, Bayer asserts that the only non-

diverse defendant, Dr. Stone, was fraudulently joined as Plaintiff failed to state a cause of action against him.

*Standard*

Remand to state court is proper if the district court lacks subject matter jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). In reviewing a motion to remand, the court must resolve all doubts in favor of remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. *In re Business Men's Assurance Co. of America,* 992 F.2d 181, 183 (8th Cir.1983) (citing *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3rd Cir.1987)cert. dismissed484 U.S. 1021 (1988)).

Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendant." *Wiles v. Capitol Indemnity Corporation,* 280 F.3d 868, 870 (8th Cir.2001). The burden is on the removing party to show that there is no possibility that the plaintiff will be able to state a cause of action against the resident defendant or that there has been outright fraud in the pleading of jurisdictional facts. *Parnas v. General Motors Corporation,* 879 F.Supp. 91, 92 (E.D.Mo.1995). In deciding this issue, the Court may consider the pleadings and supporting affidavits. *Id.*

Plaintiff has asserted a number of claims against Bayer Corporation and SmithKlineBeecham (the "Baycol Defendants") based in strict liability, negligence, misrepresentation and fraud, and breach of warranty. In support of these claims. Plaintiff alleges that Baycol was unaccompanied by proper warnings, and that the Baycol Defendants failed to perform adequate testing.*Id.* ¶ 20.Plaintiff further alleges that after the Baycol Defendants knew or should have known of Baycol's risks of serious injury, they failed to provide adequate warnings to Plaintiff and/or her physicians ..." *Id.* ¶ 22."Further, Defendants failed to warn the Plaintiff, her physicians, her insurance company or the public that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such product was not safe."*Id.* ¶ 25.In support of her misrepresentation/fraud claim, she alleges that the "Baycol Defendants, through advertising, labeling, and other communications, made misrepresentations to physicians and the public, including the Plaintiff and Plaintiff's insurance company ... about the safety and efficacy of Baycol ..."*Id.* ¶ 27."Physicians and their patients, including the Plaintiff and the insurance company, relied on these Defendants fraudulent misrepresentations, and the Plaintiff was harmed as a result."*Id.* ¶ 30.

**\*2** In her Complaint, she also asserts a claim of negligence against Dr. Stone. Specifically, she alleges that Dr. Stone "knew, or should have known, that Baycol was a dangerously defective drug which posed unacceptable risks of serious injury which were unknown and unknowable by Plaintiff."*Id.* ¶ 18.She also alleges that Dr. Stone negligently failed to warn Plaintiff of the risks associated with Baycol and that such negligence was the cause of her injuries. *Id.* ¶ 26.She further alleges that Dr. Stone could have used a safer statin, but instead prescribed Baycol. *Id.*

It is Bayer's position that given the allegations in Plaintiff's complaint, that the Baycol Defendants misrepresented the safety of Baycol, and failed to warn physicians of the serious risks associated with Baycol, Plaintiff has failed to show that Dr. Stone knew or should have known of the serious risks associated with Baycol.

Plaintiff responds that she anticipates that Bayer will assert the "learned intermediary doctrine" as a defense to Plaintiff's claims. Assuming such doctrine will apply in this case, liability will be assumed by her physician, making the physician an indispensable party. Bayer responds, however, that the learned intermediary doctrine has no bearing on whether a cause of action exists against a doctor for failure to warn of unknown risks. The Court agrees.

In determining whether a party has been fraudulently joined, the Court looks to Plaintiff's Complaint. Reading the Complaint as a whole, it is clear that the main thrust of this action is that the Baycol Defendants misrepresented Baycol's risks and failed to adequately warn of such risks. Plaintiff has not included any factual assertions in her Complaint to support the conclusory allegation that Dr. Stone

"knew or should have known" of Baycol's risks. Her conclusory allegations, however, will not defeat a finding of fraudulent joinder. *Seeeg.In re: Rezulin Products Liability Litigation,* 2003 WL 43356 at \*1 (S.D.N.Y. Jan. 6, 2003) (citing *Strickland v. Brown Morris Pharmacy Inc.,* 1996 WL 537736 at \*2 (E.D.La. Sept. 20, 1996); *In re: Rezulin Products Liability Litigation,* 133 F.Supp.2d 272, 295 (S.D.N.Y.2001).*Seealso,Silver v. H & R Block, Inc.,* 105 F.3d 394 (8th Cir.1997) (conclusory allegations not sufficient to withstand motion to dismiss). Based on the allegations contained in the Complaint, the Court finds that there is no reasonable basis in fact and law supporting a claim against Dr. Stone.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for remand is DENIED.

D.Minn.,2003.
In re Baycol Products Litigation
Not Reported in F.Supp.2d, 2003 WL 21223842 (D.Minn.)

END OF DOCUMENT

# EXHIBIT I



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

FRANK OMOBUDE, INDIVIDUALLY AND
ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JOSEPHINE
OMOBUDE, DECEASED                                          PLAINTIFF

VS.                                    CIVIL ACTION NO. 3:03CV528LN

MERCK & CO., INC. AND
ROBERT M. EVANS, M.D.                                     DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the motion of plaintiff
Frank Omobude, individually and on behalf of the wrongful death
beneficiaries of Josephine Omobude, to remand pursuant to 28
U.S.C. § 1447.  Defendant Merck & Co., Inc. has responded to the
motion and the court, having considered the memoranda of
authorities submitted by the parties, concludes that the motion is
not well taken and should be denied.

Plaintiff, a citizen of Mississippi, brought this suit in the
Circuit Court of Hinds County, Mississippi seeking to recover
damages for the alleged wrongful death of his mother, Josephine
Omobude, which he alleges resulted from her use of the
prescription drug Vioxx.  Plaintiff sued Merck, the non-resident
corporation that manufactured and distributed Vioxx, and also
named as a defendant Robert M. Evans, M.D., the local physician
who is alleged to have prescribed Vioxx to Josephine Omobude.
Merck timely removed the case on the basis of diversity

M003350751

jurisdiction under 28 U.S.C. § 1332,[1] contending, based on the allegations of plaintiff's complaint, that the requirement of an amount in controversy in excess of $75,000 is clearly satisfied,[2] and contending further that there is complete diversity of citizenship since Dr. Evans, though a Mississippi resident, has been fraudulently joined to defeat diversity.  See <u>Heritage Bank v. Redcom Labs., Inc.</u>, 250 F.3d 319, 323 (5th Cir. 2001) (fraudulent joinder of non-diverse will not defeat diversity jurisdiction).

The premise of Merck's fraudulent joinder argument, as gleaned from its notice of removal and its response to plaintiff's motion to remand, is that plaintiff's complaint does not allege a sufficient factual basis for his putative claim against Dr. Evans. In particular, Merck notes that throughout his complaint, plaintiff repeatedly and consistently asserts that Merck encouraged the use of Vioxx in "improper customers;" that it "misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects;" that despite knowledge of the defective nature of its product and for the purpose of increasing its sales and profits at the expense of the

---

[1]    That statute provides, in pertinent part, as follows: (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different states.

[2]    The court notes that plaintiff has not disputed that the amount in controversy exceeds $75,000.

2

M003350752

general public's health and safety, Merck aggressively marketed
Vioxx both directly to the consuming public and indirectly to
physicians through drug sales representatives as effective and
safe and with inadequate warnings and instructions; and that Merck
failed to provide timely and adequate post-marketing warnings or
instructions after the manufacturer knew of the risk of injury
from Vioxx.  On the basis of these allegations, plaintiff alleges
claims against Merck for strict liability, negligence, breach of
express and implied warranties and fraudulent misrepresentation.
Merck argues that in light of plaintiff's repeated allegations
that Merck misrepresented the safety and efficacy of its product
and consistently concealed the known risks and dangers not only
from the consuming public but also from physicians, plaintiff's
charge of medical negligence against Dr. Evans based on nothing
more than a conclusory allegation, wholly unaccompanied by any
factual support, that Dr. Evans "knew, or should have known, of
the dangerous side effects of these medications," and that "his
prescribing such medications in light of such knowledge presents a
deviation from the standard of care," is manifestly insufficient
to state a cognizable claim.

     In similar cases, this court has held that conclusory and
contradictory allegations of knowledge, which were belied by the
factual allegations of the complaint, demonstrated that the
resident defendants against whom such allegations of knowledge
were made, had been fraudulently joined.  See Brown v. Bristol
Myers Squibb Co., Civ. Action No. 4:02CV301LN, slip op. at 11-12

3

M0033350753

(S.D. Miss. Dec. 2, 2002) (resident physician fraudulently joined where claim was asserted in conclusory terms and contradicted by allegations of the pharmaceutical manufacturer's concealment or misrepresentation of information); <u>Louis v. Wyeth-Ayerst Pharmaceuticals, Inc.</u>, Civ. Action No. 5:02CV102LN (S.D. Miss. Sept. 25, 2000) (same with respect to resident pharmacy defendant); <u>see also</u> <u>In re Rezulin Prods. Liab. Litig.</u>, No. 00 Civ. 2843, 2003 WL 31852826, at *2 (S.D.N.Y. Dec. 18, 2002) (physician defendant fraudulently joined based on conclusory allegations). In the court's opinion, the same conclusion is in order here.

In so concluding, the court is aware of plaintiff's argument that "[a] party may plead alternative and inconsistent facts or remedies against several parties without being barred." <u>Guy James Constr. Co. v. Trinity Indus., Inc.</u>, 644 525, 530 (5th Cir. 1981). While this may be true generally, the court's point here is that the plaintiff has not pled inconsistent facts, but rather has pled consistent facts that are inconsistent with the conclusion he pleads as to Dr. Evans. Every <u>factual</u> allegation this plaintiff has made is to the effect that Merck withheld and concealed and misrepresented the true facts regarding Vioxx; and yet, without alleging any factual basis for the charge, plaintiff concludes that Dr. Evans "knew or should have known" the truth about Vioxx that Merck had misrepresented and concealed.

The court does not suggest that a "knew or should have known" allegation" will necessarily always be conclusory and hence

4

M003350754

insufficient to state a cognizable claim simply because it is not attended by a specific factual allegation as to the source of such knowledge. However, in cases like this, where a plaintiff has specifically alleged facts from which one would necessarily infer that the defendant in question would not have known information otherwise alleged to have been misrepresented or concealed from him, then in the court's opinion, in that limited circumstance, to sustain his pleading burden, the plaintiff would have to plead at least some facts tending to show why or how the defendant knew or should have known of the information that has been misrepresented to or concealed from him. Otherwise, the court would be in the untenable position of assuming that a factual basis exists for a conclusory allegation that is entirely inconsistent with every factual allegation in the complaint. No precedent of which this court is aware suggests that this would be proper.[3] The caselaw,

------

[3] Plaintiff has cited a number of cases from this district in which claims against physician and pharmacy defendants have been found sufficient to state a claim, but in the court's opinion, these cases are readily distinguishable. <u>Henderson v. GlaxoSmithKline</u>, No. 5:01CV159BrS (S.D. Miss. March 21, 2000), involved a question of fraudulent misjoinder, which is not an issue here. In <u>Hancock v. Bayer Corp.</u>, No. 3:03CV67WS (S.D. Miss. Apr. 18, 2003), plaintiff alleged that the physicians in question had committed numerous acts of negligence other than merely prescribing an allegedly defective drug, such as failing to timely recognize the plaintiffs' adverse drug reactions, failing to monitor the plaintiffs, and prescribing the drug in the wrong dosage and in a manner inconsistent with the product labeling and contraindicated usages. <u>Womack v. Bayer Corp.</u>, No. 3:03CV157WS (S.D. Miss. Apr. 18, 2003), involved specific allegations of alleged negligence by the defendant doctor, including that the physicians should have known of the risks in light of warnings actually issued to physicians by Bayer. No such claims were pled here. Likewise in the several Bayer cases remanded by Judge Pickering and cited by plaintiff, including <u>Easterling v. Bayer</u>

M003350755

in fact, is to the contrary.  See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 313 (5th Cir. 2002) (stating that the court will not "accept as true conclusory allegations or unwarranted deductions of fact"); Sago v. Wal-Mart Stores, Inc., 2003 WL 22076954, at *2 (S.D. Miss. 2003) (holding that "conclusory or generic allegations of wrongdoing on the part of the non-diverse defendant are not sufficient to show that the defendant was not fraudulently joined") (citing Badon v. RJR Nabisco, Inc., 224 F.3d 382, 392-93 (5th Cir. 2000); cf. Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1996) ("When considering a motion to dismiss for failure to state a claim, the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff.  However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."); Ross v. Citifinancial, Inc., 2003 WL 22026346, at *3 (5th Cir. 2003) (noting court's recognition of "the similarity between standards for Federal Rule of Civil Procedure 12(b)(6) (failure to state claim) and fraudulent

---

Corp., No. 2:03CV37PG (S.D. Miss. Apr. 24, 2003), Dearman v. Bayer Corp., No. 2:03CV38PG (S.D. Miss. Apr. 24, 2003), Jones v. Bayer Corp., No. 2:03CV53PG (S.D. Miss. Apr. 24, 2003), Keys v. Bayer Corp., No. 2:03CV39PG (S.D. Miss. Apr. 24, 2003), and Sumrall v. Bayer, No. 2:03CV52PG (S.D. Miss. Apr. 24, 2003), the court found that the plaintiffs had made specific allegations of negligence against the resident doctors "for failing to properly monitor and test each of the Plaintiffs according to the defendant drug companies' recommendations."  No such allegations were made in plaintiff's complaint in the case at bar.  See infra note 4.

6

M003350756

joinder" but noting that the latter inquiry is broader); Cranston
v. Mariner Healthcare Mgmt. Co., 2003 WL 21517999, at *4 (N.D.
Miss. 2003)(stating that on motion to dismiss, "[t]he court will
not accept as true any conclusory allegations or unwarranted
deductions of fact").[4]

---

[4]    The court notes that the only claim plaintiff has
alleged against Dr. Evans in his complaint is medical negligence
based on the allegation that Dr. Evans "knew, or should have
known, of the dangerous side effects of these medications" and his
prescribing "said medications in light of such knowledge."  In his
motion to remand, however, plaintiff attempts to recharacterize
and add to his claim against Dr. Evans.  He argues, for example,
that his claim that Merck produced and distributed defective
products does not preclude his claim against Dr. Evans with regard
to his "negligence in prescribing Vioxx or his negligence in
monitoring plaintiff."  He argues further that

> [j]ust as Merck failed to adequately warn Plaintiff's
> Decedent's physician, Dr. Evans failed to conduct
> regular monitoring of Plaintiff's Decedent to ensure the
> discovery of potentially serious side effects. . .
> including, not limited to, failing to perform adequate
> tests before the initiation of Vioxx treatment, and
> failing to subsequently perform other tests after
> initiation of Vioxx therapy to monitor any change in the
> status of Plaintiff's decedent. . . .  Defendant Evans
> also failed to warn Plaintiff's Decedent of possible
> side effects. . . .

None of these allegations, or any hint of such allegations,
appears anywhere in the complaint which, as to Dr. Evans, alleges
only that he was negligent in prescribing Vioxx when he knew, or
should have known, of the dangers of the drug.  Plaintiff cannot
secure remand on the basis of allegations and claims that are not
set forth in his state court pleading.  See However, the
Cavallinis did not cite, nor have we found, any case in which such
evidence has been considered to determine whether a claim has been
stated against the nondiverse defendant under a legal theory not
alleged in the state court complaint.
Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 263
263 n.14 (5th Cir. 1995)(rejecting plaintiff's "assertion that
post-removal affidavits can be used to defeat removal by
presenting new causes of action").

7

M00335075?

For the foregoing reasons, the court concludes that plaintiff's motion to remand is not well taken and should be denied.

Accordingly, it is ordered that plaintiff's motion to remand is denied.

SO ORDERED this 3rd day of October, 2003.

_____
UNITED STATES DISTRICT JUDGE

8

M003350758